FERMÍN ORTA Y OTROS, demandantes y recurridos, v. PEDRO A. PADILLA AYALA Y OTROS, demandados y recurrentes.

Número: RE-86-311          Resuelto: 30 de junio de 1992

230

*Carmelo Guzmán Géigel* y *Jaime A. Rodríguez Lecoeur*, abogados del recurrente; *Eliezer Aldarondo Ortiz* y *Miguel Pagán*, abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Una vez más nos enfrentamos a la indeseable práctica de algunos municipios de no dar fiel cumplimiento a la Ley de Personal del Servicio Público de Puerto Rico, Ley Núm.

5 de 14 de octubre de 1975 (3 L.P.R.A. sec. 1301 *et seq.*) y a las disposiciones constitucionales que prohíben el discrimen por razones políticas. Nuevamente censuramos tales prácticas y protegemos los derechos de los empleados públicos que han sido víctimas.

El servicio público, tanto a nivel central como municipal, no puede y no está sujeto a los vaivenes de la política partidista y de la administración de turno. Nuestra Constitución, leyes y reglamentos prohíben tal conceptualización. En la medida en que se respeten los derechos constitucionales y estatutarios de los empleados públicos se mejorará la administración pública, los servicios que el Estado tiene que prestar —y por los cuales pagan monetariamente todos los ciudadanos— y el Pueblo fortalecerá su fe en la democracia y en sus instituciones gubernamentales. El gobierno municipal no está exento de la aplicación de estos postulados.

A tenor con este marco conceptual, modificamos la sentencia del foro de instancia en esta acción instada por cincuenta y nueve (59) empleados del Municipio de Trujillo Alto. En síntesis, reiteramos la norma de que los municipios no son patronos, según definido ese término en la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. secs. 146–151). Concluimos, además, que: (1) la terminación de los contratos de veintidós (22) empleados transitorios bajo los programas C.E.T.A. y Acción Comunal fueron legales, pues tales empleados no tenían una expectativa de continuidad en sus puestos luego de expirados los contratos; (2) la terminación del contrato de una de estas empleadas (Sra. Juana Cruz) fue ilegal pues su contrato no había vencido a la fecha de su terminación y no se observaron las normas legales y reglamentarias para darlo por terminado válidamente. Como remedio, esta empleada no tiene derecho a ser reinstalada en su puesto sino al pago de los haberes dejados de percibir hasta el término del contrato más los daños y perjuicios que su terminación ilegal le haya

ocasionado, de probarse éstos; (3) los treinta y seis (36) empleados irregulares fueron dejados cesantes ilegal y discriminatoriamente. *Si el tribunal de instancia determina* que cumplen con los requisitos de la ley (3 L.P.R.A.sec. 711g), tendrán derecho a ser reinstalados en puestos regulares —de subsistir— y a recibir los jornales dejados de percibir más los daños y perjuicios que prueben ante el foro de instancia que tal actuación les haya ocasionado. De no existir puestos disponibles, el foro sentenciador ordenará que se le dé rango preferente en los registros de elegibles existentes en el Municipio; (4) la sociedad legal de gananciales de un empleado o funcionario público, en acciones por violación a derechos constitucionales, no responde solidariamente por los daños y perjuicios que éste ocasione en el desempeño de sus funciones, mediando un discrimen intencional en las actuaciones del funcionario; (5) los cuatro (4) empleados destituidos que no recurrieron a la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.) en jurisdicción primaria ni como agotamiento de remedios administrativos, no tenían que hacerlo por tratarse de una acción en vindicación de sus derechos constitucionales violados por las actuaciones del Alcalde, y (6) se reduce la imposición de honorarios de abogado de sesenta mil dólares ($60,000) a diez mil dólares ($10,000).

Reseñamos los hechos según surgen de los autos.

I

El presente recurso trata de la acción de *mandamus*, daños y perjuicios, y violación de derechos civiles o constitucionales por alegado discrimen político instada por cincuenta y nueve (59) ex empleados del Municipio de Trujillo Alto contra el Alcalde Pedro A. Padilla —en su carácter oficial y como representante de su sociedad legal de gananciales— y el Municipio (los recurrentes). Los demandados

recurrentes solicitan la revisión de la resolución ([1]) del foro de instancia que declaró con lugar la demanda y ordenó la reinstalación de los demandantes-recurridos a los puestos de los cuales fueron separados, el pago de salarios dejados de devengar —que serían satisfechos por el Alcalde, la sociedad de gananciales compuesta por él y su cónyuge y el Municipio solidariamente— y el pago de sesenta mil dólares ($60,000) en honorarios de abogado. Además, dispuso que la vista evidenciaria sobre daños sería señalada oportunamente a solicitud de parte.

## II

*Antecedentes*

En las elecciones generales celebradas en Puerto Rico en 1980 el recurrente Pedro A. Padilla Ayala (en adelante el Alcalde) fue electo Alcalde del Municipio de Trujillo Alto. Era el candidato del Partido Popular Democrático (en adelante P.P.D.). Derrotó al entonces Alcalde José Rivera Díaz (Nía) perteneciente al Partido Nuevo Progresista (en adelante P.N.P.).

El Alcalde tomó posesión del cargo el 13 de enero de 1981. El P.N.P. retuvo el control de la Asamblea Municipal.

El 4 de marzo de 1981 la Directora de Finanzas del Municipio de Trujillo Alto (Sra. Carmen García) le presentó al Alcalde un memorando sobre el *status* fiscal o presupuestario del Municipio a esa fecha en el que señalaba la existencia de un alegado déficit presupuestario que impediría al Municipio atender sus compromisos y obligaciones al ritmo de los gastos de funcionamiento. Tomando como base

---

([1]) Aunque los recurrentes utilizaron el recurso de revisión y el tribunal de instancia tituló su determinación como "sentencia", se trata de una resolución, ya que ésta no puso punto final al pleito sino que resolvió sólo el aspecto de responsabilidad y dejó pendiente el aspecto de daños. *Díaz v. Navieras de P.R.*, 118 D.P.R. 297 (1987). El recurso apropiado para revisar tal resolución es el *certiorari*.

ese estudio, el Alcalde dispuso la cesantía y/o destitución de treinta y seis (36) empleados irregulares a jornal entre el 10 de marzo de 1981 y el 11 de marzo de 1982. De igual manera, aduciendo una reducción de fondos federales asignados y previa instrucción de la Administración del Derecho al Trabajo (A.D.T.), ordenó la terminación del contrato de veintitrés (23) empleados por contrato bajo el Plan C.E.T.A. (*Comprehensive Employment Training Act*) y el Título II-D y VI, Programa de Acción Comunal, entre marzo de 1981 y junio de 1982.

El 9 de febrero de 1982 instaron demanda veinticuatro (24) de los empleados que habían sido cesantes entre marzo y agosto de 1981. Mediante demanda enmendada fueron incluidos los restantes treinta y cinco (35) empleados.

En síntesis, los empleados alegaban que fueron cesantes o terminados sus contratos por el nuevo alcalde —durante sus primeros meses de incumbencia— por alegada insuficiencia de fondos, pero que tal contención era un subterfugio para encubrir motivos políticos por pertenecer los demandantes al P.N.P. y por haber participado activamente en la campaña política en contra del Alcalde. Adujeron que la sociedad de gananciales del Alcalde se beneficiaba de tales actos por éstos llevarse a cabo en el curso del empleo de aquél.

Solicitaron del tribunal de instancia que declarase con lugar la demanda, dictara orden contra el Alcalde para que cumpliera "su deber ministerial de respetar el derecho de permanencia de los demandantes" (Apéndice II, pág. 4), que se ordenara la reinstalación de éstos a sus puestos, así como el pago de daños y perjuicios, intereses legales, honorarios de abogado y cualquier otro remedio que procediera en derecho.

Contestada la demanda, y luego de varios trámites procesales, se celebró el juicio. En éste testificaron veintiocho (28) empleados demandantes y se sometió abundante

prueba documental. Los demandados presentaron cinco (5) testigos. Terminada la presentación de la prueba, el foro de instancia dictó la "sentencia" objeto de revisión.

De las determinaciones de hecho del foro de instancia surge que *todos* los empleados son miembros del P.N.P. A ninguno de los empleados llamados irregulares le fue notificada su cesantía con treinta (30) días de antelación a su efectividad, asi como tampoco a ninguno de los empleados por contrato bajo el denominado Plan C.E.T.A. y el Programa de Acción Comunal. A éstos, sin embargo, se les dio por terminado sus contratos al vencerse su término, excepto la Sra. Juana Cruz.

Todos los empleados demandantes fueron nombrados por el anterior Alcalde José Rivera (Nía), perteneciente al P.N.P., quien les hizo la promesa de que se les nombraría en puestos regulares o permanentes pero nunca hizo gestión alguna a esos efectos ante la Asamblea Municipal.

Excepto una (1) de las empleadas, el resto comenzó a trabajar para el Municipio de Trujillo Alto luego de la vigencia de la Ley de Personal del Servicio Público de Puerto Rico, *supra*.

A pesar de la alegada crisis fiscal, a partir de 15 de enero de 1981 hasta el 30 de junio de 1983, la administración del Alcalde demandado nombró doscientas cuatro (204) personas con cargo a la partida de personal irregular o jornalero en posiciones iguales o similares a las ocupadas por los recurridos. Los así nombrados no aprobaron período probatorio, no tomaron exámenes de ingreso, no figuraron en registro de elegibles ni fueron certificados en un registro de elegibles a base de quinta.

Durante el contrainterrogatorio al Alcalde, se le solicitó que identificara la afiliación de veinte (20) empleados, tomados al azar, de los doscientas cuatro (204) nombrados y los identificó a todos como simpatizantes del P.P.D. No pudo, dentro de todo el grupo de doscientas cuatro (204), identificar a uno solo que fuera miembro del P.N.P.

En el presupuesto de 1982–1983 la asignación para el pago de personal irregular fue de $729,501.80, una cantidad casi *tres (3) veces* mayor a lo asignado para el pago de dicho personal en el presupuesto de 1981–1982, que fue sólo de $265, 900. Ello obedeció a que la Asamblea Municipal, controlada por el P.N.P., entendió que si se había dejado cesante y terminado el contrato a empleados por razones económicas, al aumentar dicha partida se hacía posible que éstos fueran reclutados a trabajar nuevamente. Por el contrario, el Alcalde nombró nuevo personal identificado con el P.P.D. y ninguno de los cesantes fue repuesto en su empleo ni se extendió el contrato a los así situados.

La Oficina de Personal del Municipio no fue consultada o informada sobre la forma y manera de decretarse las cesantías y la terminación de contratos. Su directora declaró que el Alcalde no utilizó alternativas tales como traslados, reubicaciones de personal, conceder licencias sin sueldo y suspensiones temporeras de empleo a fin de evitar las cesantías y la terminación de contratos. La decisión de quiénes quedarían cesantes, destituidos o a quiénes se les daría por terminado su contrato fue exclusivamente del Alcalde. Las cesantías, la terminación de contrato y los despidos fueron realizados sin tomar en consideración factores como la eficiencia de los empleados en la prestación de servicos ni la antigüedad del empleado. Tampoco se notificó a los empleados cesantes un plan de cesantía que estableciera los criterios para tal acción. De hecho, no existía ni se aprobó con posterioridad dicho plan. Además, no les fueron notificadas las cesantías con treinta (30) días de anticipación a su efectividad.

Tampoco existía en aquel momento, ni se aprobó posteriormente, un registro de elegibles ni de reingreso. De hecho, tanto bajo la administración del ex Alcalde José Rivera (Nía) como del Alcalde, los empleados irregulares no tomaban exámenes, no formaban parte de un registro de

elegibles, no se les certificaba a base de quintas ni aprobaban período probatorio alguno antes de nombrárseles en el puesto. Según la Oficial de Personal del Municipio, la práctica, tanto bajo una como bajo otra administración, era nombrar al empleado por contrato y "al terminar este volvían como jornalero o personal irregular y así sucesivamente pero que una vez comenzaban a trabajar en el Municipio de Trujillo Alto la norma invariable ... ha sido la prestación continua e ininterrumpida de los servicios como empleados irregulares o jornaleros o por contrato". Apéndice II, págs. 18–19.

De otro lado, el Alcalde no adoptó un método para decretar las cesantías como le exigía el reglamento del Municipio en estos casos. Por ello, tampoco notificó tal método a los empleados.

Hacia los meses de julio de 1981 y julio de 1982 (comienzo de los respectivos años fiscales), los empleados recurridos comparecieron a las oficinas de la Oficial de Personal del Municipio a reclamar sus puestos señalándole que tenían conocimiento de que había personas trabajando en éstos y de que había fondos disponibles. De ahí pasaron a las oficinas del Alcalde, quien no los recibió.

El Alcalde admitió durante el juicio que no había hecho gestión alguna a fin de evitar la separación o cesantía de los empleados irregulares. Admitió, además, que en 1981, 1982 y 1983 aumentó, en veinticinco (25) centavos la hora, los sueldos de los jornaleros y empleados irregulares pero no consideró reinstalar a los empleados recurridos. Por último, admitió que si bien para los años posteriores a la cesantía o terminación de contrato de los recurridos había reclutado nuevo personal irregular, no había llamado a trabajar a ninguno de los recurridos.

El informe y el testimonio de la Directora de Finanzas del Municipio intentó justificar la terminación de los contratos de los empleados bajo el plan C.E.T.A. y bajo la agencia de acción comunal con el hecho de que la Adminis-

tración del Derecho al Trabajo (A.D.T.) había dado por terminado el contrato suscrito con el Municipio el 30 de junio de 1981. Sin embargo, dicha funcionaria aceptó que luego de que la Administración de Servicios Comunales de A.D.T. dejara de hacer las aportaciones al Municipio, el Alcalde emitió una orden ejecutiva creando la Oficina de Servicios al Ciudadano con fondos municipales y desde el 1ro de junio de 1981 hasta el presente había continuado operando con tales fondos, es decir, las deficiencias de fondos federales y estatales habían sido absorbidas por el Municipio. En dicha oficina se nombró nuevo personal, perteneciente al P.P.D., sin que se renovara el contrato a ninguno de estos empleados. Según el foro de instancia, no existía impedimento alguno para que esos empleados del Plan C.E.T.A. continuasen como jornaleros o personal irregular cobrando de fondos municipales, siendo sus servicios necesarios y habiéndose nombrado, posteriormente, personas en puestos iguales o similares a los que aquéllos desempeñaban con cargo a fondos municipales.

El foro de instancia no le dio crédito al testimonio de la Directora de Finanzas del Municipio que intentó justificar las acciones del Alcalde a base del informe que reflejaba insuficiencia de fondos. Sobre el informe dispuso que éste daba "la impresión ... que se preparó teniéndose en mente el presente litigio". (Énfasis en el original suprimido.) Solicitud de revisión, pág. 16.

Sostuvo el foro de instancia que como cuestión de hecho todos los recurridos, además de pertenecer al P.N.P., en mayor o menor grado trabajaban *fuera de horas laborables* en la campaña política de 1980 del candidato P.N.P. y ex Alcalde José Rivera (Nía). Algunos fueron funcionarios de colegio electoral, identificaban con banderas sus casas, recogían fondos, pegaban pasquines, tenían insignias o *bumper stickers* en sus automóviles y asistían a reuniones políticas del P.N.P.

Finalmente, el tribunal de instancia concluyó que el Al-

calde había procedido de mala fe y en menosprecio a los derechos constitucionales de los cesantes.

## III

Ante nos los recurrentes sostienen que:

(1) Erró el Honorable Tribunal Sentenciador al concluir y determinar como cuestión de derecho que el Municipio de Trujillo Alto es un "patrono" según lo define la Ley Número 100 del 30 de junio de 1959, según enmendada, 29 L.P.R.A. 146, et. seq., y por tal razón imponerle el pago de una doble compensación o penalidad a la parte demandada-recurrente.

(2) Erró el Honorable Tribunal Sentenciador al resolver que los demandantes-recurridos, [que eran] participantes de los programas bajo el Plan CETA en el Municipio de Trujillo Alto, estaban cubiertos por los derechos provistos para los empleados públicos por la Ley de Personal del Servicio Público de Puerto Rico, Ley Núm. 5 del 14 de octubre de 1975, según enmendada, 3 L.P.R.A. 1336 (6), habiéndose eliminado dicho Plan por la Administración del Derecho al Trabajo y [al] haber ordenado la reinstalación en puestos regulares de carrera que nunca ocuparon.

(3) Erró el Tribunal Sentenciador al resolver como cuestión de derecho que las garantías procesales que se disponen por ley para los empleados de carrera en casos de cesantías (Sec. 9.3 Reglamento de Personal: Áreas Esenciales al Principio de Mérito) cubre a los 36 "empleados irregulares", así como a los 23 demandantes por contratos [que se incluyó] en la [d]eterminación de Hechos Núm. 1 de la Sentencia emitida en el caso de autos.

(4) Incidió el Honorable Tribunal Sentenciador al enunciar ciertas determinaciones de hechos que son claramente contrari[a]s a sus propias conclusiones de derecho y a la prueba practicada.

(5) Erró el Honorable Tribunal Sentenciador al determinar la presencia de discrimen político como base para las acciones tomadas por la parte demandada-recurrente en ausencia de una base fáctica suficiente en derecho para sostener tal conclusión.

(6) Erró el Honorable Tribunal Sentenciador al imponer honorarios de abogado al Alcalde demandado-recurrente y condenar a la sociedad legal de gananciales, solidariamente con el Municipio de Trujillo Alto, al pago de los salarios dejados de devengar por los demandantes-recurridos.

(7) Erró el Tribunal Sentenciador al asumir jurisdicción sobre casos de destitución de demandantes-recurridos que no agotaron los remedios administrativos después de haber sido apercibidos de su derecho apelativo por la parte demandada-recurrente. Solicitud de revisión, págs. 3–5.

Expedido el auto como uno de *certiorari*, revisamos.

### IV

■ En primer lugar, sostienen los recurrentes que cometió error el foro sentenciador al concluir que el Municipio era, como cuestión de derecho, un patrono a los fines de la Ley Núm. 100, *supra*, e imponerle la doble penalidad dispuesta en dicha ley. Tienen razón.

Recientemente resolvimos en *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990), que los municipios no son patronos según definido ese término en la Ley Núm. 100, *supra*. Igual resultado se impone en este caso. Por lo tanto, no procede la doble compensación que concede dicho estatuto.

### V

Como segundo señalamiento de error aducen los recurrentes que los veintitrés (23) empleados del programa C.E.T.A. y de Acción Comunal a quienes se les dio por terminado sus contratos no están cubiertos por los derechos garantizados en la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1336(6), y por lo tanto no procede lo ordenado en la "sentencia" en el sentido de que "deben ser reinstalados en puestos regulares de carrera ya que nunca ocuparon tales puestos".

En primer lugar, debemos aclarar que la resolución del foro de instancia no ordenó que estos empleados fueran reinstalados a puestos de carrera que nunca ocuparon sino que fueran reinstalados de inmediato "a los puestos de los

cuales fueron separados por motivos políticos y en violación de sus derechos civiles ...". Apéndice II, pág. 82. De suerte que el alcance de la resolución sería retornar a los empleados a los puestos de los cuales fueron removidos por el Alcalde.

En Puerto Rico, un empleado público tiene un reconocido interés en la retención de su empleo si dicho interés está protegido por la ley (empleado de carrera) o cuando las circunstancias crean una expectativa de continuidad. *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990); *Pierson Muller I v. Feijoó*, 106 D.P.R. 838, 852 (1978). De ahí que aquellos empleados con carácter permanente posean una expectativa de continuidad en el empleo, que forma parte de su derecho de propiedad, de la cual no pueden ser privados sin que medie el debido proceso de ley. Art II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1; Emdas. V y XIV, Const. EE. UU., L.P.R.A., Tomo 1; *Torres Solano v. P.R.T.C.*, supra.

Los veintitrés (23) empleados del programa federal C.E.T.A. y el Programa de Acción Comunal eran empleados por contrato cuya duración tenía un término fijo. Estos empleados son clasificados en la Ley de Personal del Servicio Público de Puerto Rico como empleados transitorios. Al respecto, disponía la Sec. 4.3(11) y (12) de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1333(11) y (12) (Sup.1978).

> (11) Se podrá establecer *mediante reglamento* procedimientos especiales de reclutamiento y selección para puestos de trabajadores no diestros o semidiestros, *para puestos de duración fija, para programas financiados con fondos federales* o especiales, cuando no se disponga de registros de elegibles apropiados para determinadas clases de puestos y la urgencia del servicio a prestarse lo justifique, y para becarios de programas de adiestramiento para el servicio público que hayan sido seleccionados mediante un proceso de competencia.
>
> (12) *Las personas nombradas en puestos de duración fija tendrán status transitorio.* La duración de estos nombramientos

corresponderá al período por el cual se cree el puesto. Podrán efectuarse nombramientos transitorios en puestos permanentes según se determine mediante Reglamento. (Énfasis suplido.)

A tenor con este mandato, el Municipio de Trujillo Alto adoptó un reglamento de personal que cobijaba a estos empleados.

La Sec. 8.5 de dicho reglamento dispone que se adoptaría un método o plan cuando sea necesario decretar cesantías y que dicho método se pondría en conocimiento de los empleados. Además, dispone dicha sección que a cada empleado individual que fuera dejado cesante se le notificará "por escrito con no menos de 30 días de anticipación a la fecha en que [fueran a ser cesanteados]". Apéndice II, pág. 15. En la referida notificación de cesantía debía, además, informársele al empleado de su derecho de apelación ante la Junta de Apelaciones de Personal dentro de los treinta (30) días a partir del recibo de la notificación correspondiente. De acuerdo con la Sec. 8.5, supra, "ninguna cesantía de empleados será efectiva a menos que se cumpla con el requisito de notificación" (íd., pág. 16) previamente establecido.

De suerte que, independientemente de quién pagará su sueldo, el Municipio mismo se obligó a garantizar este mínimo proceso de ley antes de dar por terminado los contratos de estos empleados. Para poder válidamente despedirlos por falta de fondos, el Alcalde venía obligado a seguir el trámite provisto en su Reglamento de Personal. Véase al respecto *Pizarro v. Municipio de Carolina*, 112 D.P.R. 822, 828–829 (1982).

Sin embargo, esa obligación del Municipio se limita a cuando da por terminado los contratos de los empleados transitorios dentro del término de su nombramiento. En *Delgado v. D.S.C.A.*, 114 D.P.R. 177, 181 (1983), aclaramos que las garantías dispuestas en la Sec. 4.6 (6) de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A.

1336(6), y en la Sec. 9.3 del Reglamento de Personal, Áreas Esenciales al Principio de Mérito, 1976, sólo aplicaban a los empleados transitorios a quienes se les daba por terminado su contrato dentro del término de sus nombramientos.

La razón para ello es sencilla. Estos empleados sólo tienen una expectativa de continuidad en el empleo durante el término de su nombramiento, excepto que las circunstancias le creen esa expectativa más allá del término. Sólo durante el término de nombramiento tienen la protección de la Ley de Personal del Servicio Público de Puerto Rico, el Reglamento de Personal y el Reglamento del Municipio. Si alguna duda quedaba al respecto, fue aclarada en *Depto. Recs. Naturales v. Correa*, 118 D.P.R. 689 (1987). Allí, al igual que en el caso ante nos, se trataba de un empleado transitorio participante del programa federal C.E.T.A. cuyo contrato no fue renovado a su vencimiento. Este alegaba poseer una expectativa de continuidad en su puesto debido a las renovaciones automáticas de su contrato y a una promesa de que se crearía un puesto permanente en su caso.

En *Depto. Recs. Naturales v. Correa*, supra, pág. 694, al delimitar la naturaleza y el alcance de la retención de los empleados transitorios, como los participantes del programa federal C.E.T.A. y otros, advertimos que la Ley de Personal del Servicio Público de Puerto Rico provee para el nombramiento de este tipo de personal, 3 L.P.R.A. secs. 1333(12) y 1336(9), pero:

La autorización para la creación de puestos transitorios tenía por objeto proveer un mecanismo "para atender las necesidades de personal adicional temporero, en situaciones de aumentos periódicos en el volumen de trabajo, actividades de corta duración, y sustitución de empleados regulares en uso de licencia". Oficina de Personal, Circular Núm. 83 de 11 de marzo de 1958. *La esencia del nombramiento transitorio es su duración fija.* Responde este tipo de puesto a la necesidad de brindarle a las

agencias y departamentos del gobierno flexibilidad para atender las demandas de personal con carácter inmediato, pero a la vez temporero, surgidas por situaciones imprevistas o de emergencia, las cuales no pueden afrontarse con el personal regular. (Énfasis suplido.)

## Aclaramos que:

*Dado que los empleados transitorios son nombrados para atender necesidades de personal imprevistas o de emergencia, se utiliza un procedimiento especial que agiliza el reclutamiento y selección del personal necesario.* (Énfasis suplido y escolio omitido.) *Depto. Recs. Naturales v. Correa,* supra, pág. 695.

## Finalmente, concluimos que:

Examinada la Ley de Personal, el reglamento y el historial legislativo de esa medida, concluimos que un nombramiento transitorio genera expectativa de retención en el empleo *sólo durante el término del nombramiento.*Ante el claro mandato legislativo, resulta inescapable concluir que bajo las disposiciones de la Ley de Personal del Servicio Público un empleado transitorio no goza de derecho a permanencia en su puesto ni tiene expectativa legítima de retención en el mismo una vez ha vencido el nombramiento. Véase también *Cheveras Pacheco v. Rivera González,* No. 86-1428, slip op. (1er Cir. enero de 1987). (Énfasis suplido y en el original.) *Depto. Recs. Naturales v. Correa,* supra, pág. 697.

■ En cuanto a si una promesa u ofrecimiento de una plaza permanente al empleado transitorio podía crear una expectativa de retención en su empleo, señalamos que:

*No cabe duda de que el ofrecimiento de un puesto de carrera fue sólo una promesa que no estuvo acompañada de trámite o gestión alguna dirigida a efectivamente concederle permanencia. El simple ofrecimiento de una plaza permanente sin actos por parte de la agencia que inequívocamente evidencien un acuerdo de convertir el ofrecimiento en realidad, no puede ser suficiente para conferir al recurrido algo más que una expectativa unilateral de retención en el empleo. Perry v. Sindermann,* 408 U.S. 593, 601–602 (1972); *Board of Regents v. Roth,* supra, pág. 577; *Wells v. Bd. of Regents of Murray State University,* 545 F.2d 15 (6to Cir. 1977); *Bertot v. School District*

*No. 1, Albany County, Wyo.*, 522 F.2d 1171 (10mo Cir. 1975). Por el contrario, el recurrido era consciente de que la plaza que ocupaba era una transitoria, y a término fijo. *Haimowitz v. University of Nevada*, 579 F.2d 526 (9no Cir. 1978). *El que ostenta un nombramiento transitorio, con el conocimiento de que el mismo vence transcurrido el término para el cual fue expedido, no puede sostener válidamente que tiene una expectativa real de que dicho tipo de nombramiento le brinda permanencia en su empleo o derecho a que el mismo se le extienda constantemente.* (Énfasis suplido.) *Dept. Recs. Naturales v. Correa*, supra, pág. 699.

En cuanto a la renovación continua de los contratos, añadimos:

En cuanto al argumento de haber hecho del servicio público su vocación, reiteramos que *"el mero hecho de ocupar una posición por un prolongado período de tiempo no crea por sí solo un interés propietario ..."*. *Morales Narváez v. Gobernador*, supra, pág. 768 (1982); *Bollow v. Federal Reserve Bank of San Francisco*, 650 F.2d 1093 (9no Cir. 1981). (Énfasis suplido.) *Depto. Recs. Naturales v. Correa*, supra, pág. 699.

*Hemos examinado cuidadosamente todos los contratos de servicios y nombramientos de estos veintitrés (23) recurridos y sólo en el caso de la Sra. Juana Cruz el Municipio dio por terminado su contrato antes de vencerse su término. En los restantes veintidós (22) casos, a los empleados se les notificó la terminación de los contratos con efectividad al vencimiento de término.*

*A la luz de la normativa expuesta, debemos concluir que la terminación de los contratos de esos veintidós (22) empleados transitorios fue legal puesto que el Municipio no venía obligado a ofrecer las garantías de ley y reglamentarias antes señaladas. Erró el foro de instancia al resolver que las mismas fueron ilegales.*

En estos casos *no hay prueba suficiente para sostener que esos empleados transitorios abrigaron una expectativa de continuidad en sus puestos luego de expirados sus contratos.* La única prueba al respecto es la estipulación de

las partes en el sentido de que, de declarar, sus testimonios establecerían que para julio de 1980, el entonces Alcalde de Trujillo Alto, José A. Rivera Díaz (Nía), les prometió crear unos puestos regulares para ellos. Pero después de tal promesa *el entonces Alcalde no hizo gestión alguna ante la Asamblea Municipal para crear los puestos.* Además, señalaron que sus contratos de servicio eran renovados continuamente, desde 1976, por el entonces Alcalde Nía. De acuerdo con lo resuelto en *Depto. Recs. Naturales v. Correa,* supra, *esa prueba es insuficiente en derecho para crear una expectativa de continuidad en el empleo.*

Ahora bien, en cuanto a la Sra. Juana Cruz debemos concluir que la terminación de su contrato fue ilegal. Esta señora fue nombrada el 31 de diciembre de 1980 para ocupar un puesto transitorio de secretaria en el Centro de Envejecientes del Municipio de Trujillo Alto. Su contrato expiraba el 31 de marzo de 1981. Sin embargo, se le notificó la terminación de su contrato el 9 de febrero de 1981 alegadamente por no haber sido aprobada una propuesta del Centro de Envejecientes en la que se consideraba el puesto de secretaria, por ella ocupado, como uno de nueva creación. La razón era de índole presupuestaria.

Hemos visto que no basta con que en el Municipio exista una crisis fiscal para validar automáticamente toda terminación de contrato. Se requiere que la autoridad nominadora la decrete conforme la ley, las normas y los trámites reglamentarios que, como garantía mínima del debido proceso de ley, son extendibles a los empleados transitorios e irregulares. *Calzada Quiñones v. D.A.C.O.,* 114 D.P.R. 757, 760 (1983).

A tenor con la situación en el caso de la señora Cruz, sólo cabe la conclusión de que la terminación de su contrato fue nula, pues al decretarla los recurrentes no observaron las normas de ley y reglamentarias aplicables. Quedó demostrado que el Municipio de Trujillo Alto carecía

de un plan de cesantías; que las cesantías no fueron notificadas a los empleados con treinta (30) días o más de antelación a la fecha de su efectividad (de hecho, en el caso de la señora Cruz la terminación de su contrato fue efectiva el mismo día en que se le notificó) y, obviamente, por no existir plan de cesantías, no le fue notificado a dicha persona.

■ Ahora bien, el remedio al que tiene derecho la señora Cruz no se extiende a la reinstalación al puesto transitorio del cual fue ilegalmente removida. La particular naturaleza del empleo transitorio permite que ante una terminación de contrato ilegal del empleado, *antes de vencerse su nombramiento*, el remedio legal se limite al pago de los haberes dejados de percibir hasta el término del nombramiento más los daños y perjuicios que tal actuación ilegal le hubiese ocasionado, de probarse éstos. Siendo empleado por contrato con término fijo, ése es el remedio disponible. *Cf.* Art. 1476 del Código Civil, 31 L.P.R.A. sec. 4114; *Depto. Recursos Naturales v. Correa*, supra; *Delgado v. D.S.C.A.*, supra.

Procede, pues, modificar este aspecto de la resolución para eliminar su disposición que ordena la reinstalación de estos veintitrés (23) empleados a los puestos que ocupaban antes de las cesantías. Debe reconocerse, sin embargo, el derecho de la señora Cruz al pago de haberes dejados de percibir *durante el resto de vigencia de su contrato y los daños y perjuicios que en su día pruebe ante el foro sentenciador.*[2]

---

[2] La conclusión a la que hemos llegado hace innecesario pasar juicio sobre la alegación de los recurrentes en el sentido de que once (11) de estos veintitrés (23) empleados obtuvieron sus contratos o su renovación ilegalmente durante el periodo de veda dispuesto en la Sec. 4.7 de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1337. Notamos, sin embargo, que es ante nos donde por vez primera se levanta el punto. Hemos resuelto que no consideremos este tipo de alegación que no se hizo a nivel de instancia. *Cf. Murcelo v. H.I. Hettinger & Co.*, 92 D.P.R. 411 (1965).

# VI

Sostienen los recurrentes que los treinta y seis (36) empleados irregulares o jornaleros no están cubiertos por las garantías procesales para cesantías dispuestas en la Sec. 9.3 del Reglamento de Personal, *supra*, y que, por el contrario, el nombramiento de estos empleados después de entrar en vigor la Ley de Personal del Servicio Público de Puerto Rico en 1976 los convierte en nombramientos ilegales. El señalamiento carece de méritos.

Precisamente en *Pizarro v. Municipio de Carolina*, 112 D.P.R. 822 (1982), resolvimos que los jornaleros o empleados irregulares estaban cubiertos *por las salvaguardas procesales* de la ley y el reglamento de personal, salvo que se demostrara que su relación con el municipio era una de contratista independiente a principal. Aquí no existe prueba en tal sentido.

■ A pesar de que en *Pizarro v. Municipio de Carolina*, supra, advertimos que luego de aprobada la Ley de Personal del Servicio Público de Puerto Rico en 1975 no se justificaba mantener la clasificación de jornaleros y los municipios debían proceder a clasificar a esos empleados en puestos regulares o transitorios conforme a lo dispuesto en la Sec. 4.2(7) (3 L.P.R.A. sec. 1332(7)), parece que la práctica se ha mantenido inalterada en algunos municipios. Nuevamente condenamos esa práctica impermisible que socava el sistema de mérito contenido en la ley y que crea un sistema paralelo de personal que a todas luces no está autorizado en ley. Recordemos que:

En consonancia con el objetivo de "[l]lograr que la administración pública se rija por criterios de la mayor uniformidad, equidad, y justicia", la Ley —Sec. 5.9— limita las clasificaciones de empleados a empleados de confianza y de carrera. 3 L.P.R.A. sec. 1349. Los de carrera comienzan como probatorios y luego se convierten en regulares —Sec. 4.3, 3 L.P.R.A. sec. 1333 (10). La Ley permite además el reclutamiento y selección

de empleados transitorios —Sec. 4.3, incisos (11) y (12), 3 L.P.R.A. sec. 1333 (11) y (12). La categoría de empleados irregulares no está reconocida en la nueva ley. (Énfasis suplido y escolios omitidos.) *Pizarro v. Municipio de Carolina*, supra, pág. 827.

Ahora bien, la actuación ilegal del Municipio no puede afectar la posición de los empleados a jornal aquí recurridos. Como en el caso de los transitorios, a éstos puede dejárseles cesantes por falta de fondos siempre que el Municipio lo haga siguiendo lo establecido en su reglamento y en la sec. 9.3 del Reglamento de Personal, *supra*, en cuanto a que la autoridad nominadora establezca y notifique un método de cesantías que ha de seguirse; tome en cuenta la eficiencia y el tiempo de servicio en dicho método, y se notifique a cada empleado que ha de ser cesante con por lo menos treinta (30) días de antelación. *De lo contrario, ninguna cesantía sería efectiva.* Sec. 8.5 del Reglamento de Personal del Municipio de Trujillo Alto.

Ninguno de estos requisitos fueron cumplidos al dejar cesantes a los treinta y seis (36) empleados irregulares o a jornal en este caso. En *Pizarro v. Municipio de Carolina*, supra, señalamos la importancia del estricto cumplimiento con estos requisitos.

Por último, nos llama la atención que sea a este nivel apelativo que los recurrentes señalen que los nombramientos de los recurridos como jornaleros eran ilegales para sostener la validez de las cesantías. A nivel de instancia los recurrentes sostuvieron que la razón para dejar cesantes a los demandantes fue, en la mayoría de los casos, la falta de fondos en las arcas municipales. En algunos casos señalaron que la justificación de la cesantía fue el ausentismo del empleado. La prueba demostró que ambas razones eran injustificadas. Por otro lado, los recurrentes no tienen las manos limpias al hacer este planteamiento. La prueba demostró que luego de las cesantías de estos recurridos el Municipio continuó nombrando empleados irregulares y

jornaleros. Más aun, quedó probado que el Municipio podía tomar medidas menos drásticas que las cesantías para hacer frente a la alegada crisis presupuestaria y no lo hizo. No se intentó reubicar a los empleados o reducir sus jornadas de trabajo. Aun luego de que la Asamblea Municipal triplicara el presupuesto para cubrir cualquier insuficiencia de fondos y llamar nuevamente a estos empleados a sus labores, el Alcalde prefirió nombrar nuevos empleados irregulares (afiliados a su partido) con esos fondos.

■ *De determinar el tribunal de instancia que estos empleados cumplen con los requisitos de ley, 3 L.P.R.A. sec. 711g*, tendrán derecho a ser reemplazados en puestos regulares y a recibir los jornales dejados de percibir más cualesquiera daños y perjuicios que la actuación ilegal del Alcalde les hubiera ocasionado. *Cf. Pizarro v. Municipio de Carolina*, supra. Contrario a los empleados transitorios, los empleados irregulares pueden adquirir categoría de regulares si se cumplen los requisitos de ley. 3 L.P.R.A. sec. 711g. La cesantía ilegal de estos empleados tronchó esta posibilidad. Procede, pues, devolver el caso al foro de instancia *para que examine si estos empleados cumplen con los requisitos de ley para ser reclasificados como regulares y ser repuestos en tales puestos* de éstos subsistir. De no existir puestos disponibles, el foro sentenciador ordenará que se le dé rango preferente en los registros de elegibles existentes en el Municipio. Procede, además, el pago de salarios dejados de percibir y la devolución al foro de instancia para que determine el monto de los daños sufridos por éstos.

## VII

¿Fueron las cesantías de estos treinta y seis (36) empleados, además de ilegales, discriminatorias por razón de ideas políticas? La prueba sostiene que lo fueron.

■ En *Pizarro v. Municipio de Carolina*, supra, señalamos que las cesantías decretadas sin observarse las garantías de la Ley de Personal y su reglamento guardan una íntima relación con la tesis de que tales cesantías obedecieron a motivos discriminatorios.

■ El análisis que ha de ser utilizado por el foro judicial para determinar si el despido o cesantía de empleados irregulares respondió o no a razones de discrimen político-partidista, quedó expuesto por este Foro en *Báez Cancel v. Alcalde Mun. de Guaynabo*, 100 D.P.R. 982, 989–990 (1972).

[3] No se adujo justificación alguna para dejar cesantes a los recurrentes. Se recordará que el tribunal no adoptó la versión del Alcalde al efecto de que los recurrentes habían abandonado sus puestos y de que él nunca se había negado a darles empleo. Estamos de acuerdo que si se hubiera aducido alguna justificación razonable la cesantía no hubiese implicado discrimen alguno. *Pero cuando sin justificación razonable alguna se dejan cesantes a un grupo de trabajadores de clara identificación política-partidista e inmediatamente se le sustituye con otro grupo de diferente filiación partidista, como sucedió en el presente caso, se crea una fuerte presunción de discrimen. Más aun cuando estos hechos ocurren justamente al cambio de una administración municipal a otra de distinto partido.*
[4] Tampoco puede aceptarse el argumento de que el Alcalde tiene amplia discreción para emplear y despedir a los trabajadores irregulares. El hecho de que estas facultades sean discrecionales no puede justificar, excusar o condonar el discrimen. El ejercicio de discreción no puede servir de mampara al discrimen. De lo contrario, será fácil evadir artificiosamente la prescripción constitucional.

[6] El capricho, sin embargo, no debe ser favorecido por la ley. *Por eso si no hay un motivo racional que justifique el despido y se sustituye al empleado por otro de diferente afiliación política, que resulta ser la misma del Alcalde, se crea una presunción de discrimen que el Alcalde viene obligado a refutar.* ... (Énfasis suplido.) Véase, además, *Rodríguez Cruz v. Padilla Ayala*, supra.

Aquí todos estos recurridos eran miembros, algunos mi-

litantes activos, del P.N.P. Tan pronto ocurre el cambio de administración en el Municipio de Trujillo Alto en las elecciones de 1980 el Alcalde, perteneciente al P.P.D, dejó cesantes a los treinta y seis (36) empleados recurridos en los primeros meses de su administración alegando insuficiencia de fondos. Más aun —y a pesar de la alegada crisis fiscal— a partir de 15 de enero de 1981 y hasta el 30 de junio de 1983, el Alcalde recurrente nombró doscientas cuatro (204) personas con cargo a la partida de personal irregular o jornaleros, esto es, en posiciones iguales o similares a las que ocupaban los recurridos. Todos estos nuevos nombramientos se extendieron a personas identificadas con el Partido Popular Democrático, esto es, el partido al cual pertenece el entonces Alcalde. Dentro de ese grupo de doscientos cuatro (204) empleados el Alcalde no pudo identificar a uno solo que fuera miembro del P.N.P.

Estas circunstancias, unidas al hecho de que al decretar las cesantías no se observaron las garantías reglamentarias y de ley, establecen una fuerte presunción o inferencia de discrimen político en la actuación del Alcalde. *Cf. McCrillis v. Aut. Navieras de P.R., 123 D.P.R. 113 (1989); Ramos v. Srio. de Comercio*, 112 D.P.R. 514 (1982). Correspondía al Alcalde demostrar que había una justificación razonable para decretar las cesantías que fuese ajena a motivaciones discriminatorias político-partidistas. *Báez Cancel v. Alcalde Mun. de Guaynabo*, supra.

De la prueba presentada en autos, no surge justificación razonable alguna para las cesantías decretadas por el Alcalde. Veamos.

La justificación adelantada por el Municipio para decretar las cesantías fue el alegado déficit presupuestario que, según un estudio de las finanzas municipales, existía al momento en que el nuevo Alcalde toma posesión de su cargo. Ese estudio tiene fecha de 4 de marzo de 1981.

Lo que resulta increíble es que si existía la crisis presupuestaria aducida por el Municipio —lo que alegadamente

provocó la cesantía de veinticinco (25) empleados irregulares porque para la segunda semana de abril no habría fondos para el pago de jornales al ritmo de $14,000 semanales de dicha nómina— el Alcalde reclutara a veintidós (22) jornaleros y empleados irregulares nuevos entre el 15 de enero de 1981 y el 30 de junio de ese año, y noventa y cuatro (94) jornaleros e irregulares nuevos entre el 1ro de julio de 1981 y el 30 de junio de 1982, y que todos estos ciento dieciséis (116) nuevos jornaleros e irregulares pertenecieron a su partido. ¿Con qué fondos se les pagaría a estos nuevos empleados si existía la referida crisis presupuestaria? Más aun, cómo se explica que ante la alegada crisis y para los años fiscales 1981, 1982 y 1983 el Alcalde aprobara un aumento de sueldo de veinticinco (25) centavos por hora a estos nuevos jornaleros y empleados irregulares. ¿De dónde provino ese aumento si había una crisis fiscal? Forzosa es la conclusión de que la alegada crisis presupuestaria fue sólo un subterfugio para dejar cesantes a los recurridos y que la razón verdadera fue el discrimen político. Recuérdese, además, que para el periodo 1982–1983, la Asamblea Municipal (controlada por el P.N.P.) decidió triplicar el presupuesto de la partida para el pago de personal irregular y a jornal. Sin embargo, el Alcalde Padilla no repuso a ninguno de los cesantes sino que continuó reclutando nuevo personal (ochenta y ocho (88) empleados de 1ro de julio de 1982 a 30 de junio de 1983) pertenecientes a su partido. De suerte que los recurrentes no demostraron justificación razonable para decretar las treinta y seis (36) cesantías de los empleados irregulares. *Cf. Olivieri Morales v. Pierluisi*, 113 D.P.R. 790 (1983).

No erró el foro sentenciador al determinar que las cesantías de estos treinta y seis (36) empleados respondieron a motivaciones puramente políticas. No intervendremos con esa determinación. Lo que refleja la prueba es una actuación de discrimen intencional de parte del Alcalde.

El foro sentenciador encontró probado que las actuacio-

nes del Alcalde le causaron daños, sufrimientos y angustias mentales a estos recurridos. Los recurrentes no cuestionaron esa determinación y nosotros encontramos que ésta encuentra apoyo en la prueba. Como señalamos, procede la devolución del caso al foro sentenciador para la fijación del importe.

## VIII

Sostienen los recurrentes que erró el foro de instancia al condenar *a la sociedad legal de gananciales* constituida por el Alcalde y su esposa a pagarles los salarios dejados de devengar por los recurridos solidariamente con el Municipio de Trujillo Alto. Según aquéllos, "[l]a sociedad legal de gananciales constituida por el Alcalde recurrente y su cónyuge *no tuvo nada que ver con las determinaciones tomadas por éste en su carácter como tal. Nada hay en los autos que establezca un nexo de causa y efecto, y, por tanto, de responsabilidad que alcance a la sociedad legal de gananciales.* Más aún, la sociedad legal de gananciales no violó los derechos civiles de ninguno de los demandantes recurrentes. Los civiles se esgrimen frente al Estado, no frente a ning[u]na sociedad legal de gananciales". (Énfasis suplido.) Solicitud de revisión, pág. 19.

La cuestión planteada es, pues: ¿responde solidariamente la sociedad legal de gananciales de un funcionario público por los daños y perjuicios que éste cause en el desempeño de sus funciones oficiales, mediando intención, por el solo hecho de que ésta recibe los beneficios económicos de los ingresos del empleo de dicho funcionario? Resolvemos que no.

Dispone el Art. 1308 del Código Civil, 31 L.P.R.A. sec. 3661, en lo aquí pertinente, que:

Serán de cargo de la sociedad de gananciales:

1. Todas las *deudas* y *obligaciones contraídas durante el matrimonio* por cualquiera de los cónyuges. (Énfasis suplido.)

*Este artículo se refiere a las obligaciones contractuales.*
El Art. 1310 del Código Civil, 31 L.P.R.A. sec. 3663, añade:

... [E]l pago de las deudas contraídas por el marido o la mujer antes del matrimonio no estará a cargo de la sociedad de gananciales.
*Tampoco lo estará el de las multas y condenas pecuniarias que se les impusieren.*
Sin embargo, el pago de las deudas contraídas por el marido o la mujer con anterioridad al matrimonio, *y el de las multas y condenas que se le impongan, podrá repetirse contra los gananciales después de cubiertas las atenciones que enumera la sec. 3661 [Art. 1308 del Código Civil], si el Cónyuge deudor no tuviese capital propio o fuera insuficiente*; pero al tiempo de liquidarse la sociedad se le cargará lo satisfecho por los conceptos expresados. (Énfasis suplido.)

Interpretando estos dos (2) artículos, *en el ámbito de los daños y perjuicios* causados por la negligencia de personas privadas, expresamos en *Lugo Montalvo v. González Mañón*, 104 D.P.R. 372, 378 (1975), que la "responsabilidad civil extracontractual, la responsabilidad será personal o de la sociedad de gananciales según los hechos que la produjeron. Generalmente se reconoce que si la acción o gestión del marido [o la mujer] *aprovecha económicamente* la masa ganancial, la responsabilidad también será de cargo de dichos bienes". (Énfasis suplido.) Este análisis del beneficio económico a la masa ganancial fue el que utilizamos en *Albaladejo v. Vilella Suau*, 106 D.P.R. 331 338 (1977), para imponer responsabilidad en el ámbito privado a la sociedad de gananciales Vilella Suau por los daños ocasionados por el esposo al sufrir un accidente mientras conducía un vehículo de motor en gestiones de su empleo. Allí sostuvimos: "*Su empleo es para beneficio de la sociedad de gananciales* por lo que ésta responde de los daños causados." (Énfasis suplido.) Finalmente, en *Asociación de*

*Propietarios v. Santa Bárbara Co.*, 112 D.P.R. 33, 49–50 (1982), resolvimos que la sociedad de gananciales de un socio en una sociedad profesional responde solidariamente por los daños y perjuicios en que incurre dicho socio *mediando negligencia;* al respecto expresamos que:

> *La regla, generalmente reconocida, es que si la gestión del integrante aprovecha* económicamente a la masa ganancial, la responsabilidad también será a cargo de dichos bienes. En este sentido no es convincente el planteamiento de los recurridos de que al no percibir directamente el ingreso del Ingeniero Ariel Gutiérrez la sociedad de gananciales y sí otra entidad jurídica —la Sociedad E.H.G. Arquitectos e Ingenieros— ello exime de tal responsabilidad. La base del argumento —que la sociedad ganancial no se beneficiaba directamente de las gestiones realizadas por el Ingeniero Ariel Gutiérrez— es errónea. En una sociedad civil los verdaderos recipientes de ingresos son los socios que la componen, en este caso Gutiérrez. (Énfasis en el original suprimido y énfasis suplido.)

En este caso tenemos que resolver si debido al hecho de que los alegados daños y perjuicios sean causados por un funcionario público por sus actuaciones de discrimen intencional en el desempeño de las funciones de su cargo, debemos apartarnos de la norma establecida en *Lugo Montalvo v. González Mañón*, supra; *Albaladejo v. Vilella Suau*, supra, y *Asociación de Propietarios v. Santa Bárbara Co.*, supra. Veamos.

▪ Hemos sostenido que cuando la condena en daños surge de un acto ilegal, de un delito o crimen intencional cometido únicamente por uno de los cónyuges, la sociedad de gananciales no viene obligada a responder económicamente, en primer lugar, por tales daños. *Sepúlveda v. Maldonado Febo*, 108 D.P.R. 530, 534 (1979); *Lugo Guzmán v. Santiago Albino*, 87 D.P.R. 623 (1963); *Rivera v. Martínez*, 70 D.P.R. 482 (1949); *Rivera v. Casiano*, 68 D.P.R. 190 (1948); *Shaw v. Greer*, 194 P.2d 430 (Ariz. 1948); *Edmonds v. Ashe*, 537 P.2d 812 (Wash. 1975); *de Elche v. Jacobsen*,

622 P.2d 835 (Wash.1980); E.A. Zannoni, *Derecho de Familia*, Buenos Aires, Ed. Depalma, 1978, T. 1, pág 537; M.J. Méndez Costa, *Las Deudas de los Cónyuges*, Buenos Aires, Ed. Astrea, 1979, págs. 85–86; Anotación, *Liability of Community Property of Husband and Wife for Fine or Penalty Imposed upon, or Costs Taxed against, One of the Spouses*, 106 A.L.R. 1011.

En tales casos, el demandante viene obligado a hacer excusión de los *bienes privativos* del cónyuge convicto, luego de su mitad de gananciales y, de no ser suficiente, ir en contra de la mitad de gananciales del otro cónyuge. En su día, al liquidarse la sociedad de gananciales, se le reconocerá a este último un crédito por lo satisfecho en la condena de daños. Art. 1310 (31 L.P.R.A. sec. 3663 *in fine*).

*Igual norma* opera cuando el funcionario público es condenado al pago de daños al incurrir en *conducta criminal intencional*. Véanse: *Shaw v. Green*, supra; *Edmonds v. Ashe*, supra. La responsabilidad es principalmente personal en tales casos. No encontramos consideraciones de orden público para variar la norma en tales circunstancias. De hecho, el Estado está inmune frente a las reclamaciones de individuos que sufren daño por las actuaciones de sus empleados o funcionarios, tanto daños a la persona o propiedad, cuando tal actuación constituye un delito. Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. sec. 3077 *et seq.; Galarza Soto v. E.L.A.*, 109 D.P.R. 179 (1979).

Examinamos la situación cuando se trata de actos u omisiones discriminatorias e intencionales del funcionario público. En *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985), resolvimos que un despido discriminatorio y en violación a derechos constitucionales del empleado es una actuación intencional del patrono. Nuestra Constitución, la ley y nuestra jurisprudencia con-

denan el discrimen por ideas políticas dentro del empleo público.

■ En el caso de autos la prueba demuestra que las actuaciones del Alcalde iban dirigidas a intencionalmente discriminar por ideas políticas contra los recurridos. En tales circunstancias deben responder los bienes privativos del Alcalde, en primer término, de los daños y perjuicios que personalmente ocasionó con sus actuaciones. No responden los bienes gananciales hasta tanto los perjudicados hagan excusión de bienes del causante de los daños. *Cf.* Art. 1310 del Código Civil, *supra.*

Por ello, en el caso de autos la sociedad legal de gananciales, a la cual pertenece el Alcalde, no responde solidariamente con éste por los daños causados en el desempeño de sus funciones públicas. De probarse tales daños, responderá subsidiariamente.

## IX

Alegan los recurrentes que el tribunal de instancia carecía de jurisdicción sobre la reclamación de cuatro (4) empleados que fueron destituidos.

Sostienen los recurrentes que los empleados recurridos Eduviges Rivera, Héctor Román González Betancourt, Santos Camacho Ortiz y Fundador Toledo Díaz fueron destituidos por justa causa y en sus cartas de destitución se les apercibió de su derecho a acudir a la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.) y que dichos empleados no acudieron a J.A.S.A.P. en agotamiento de remedios administrativos.

■ Tal contención carece de méritos. Cuando un empleado público, como en este caso, reclama violación a sus derechos constitucionales, tal acción no tiene que litigarse en jurisdicción primaria ni tiene que agotarse el remedio administrativo. *Pierson Muller I v. Feijoó*, supra; *Otero*

*Martínez v. Gobernador,* 106 D.P.R. 552 (1977); Comentario, *Exhaustion of State Administrative Remedies in Section 1983 Cases,* 41 U. Chi. L. Rev. 537 (1974). Además, el tribunal de instancia determinó, como cuestión de hecho, que a estos cuatro (4) empleados irregulares se les había formulado cargos por abandono de su puesto;[3] no se les concedió una vista previa ni posterior a la destitución en el Municipio ni oportunidad de clase alguna de presentar su versión de lo que se le imputaba. En tales circunstancias no era necesario agotar el trámite administrativo. *García Cabán v. U.P.R.,* 120 D.P.R. 167 (1987).

## X

Finalmente, se queja el Alcalde de la imposición de $60,000 de honorarios de abogado. Tal condena fue impuesta al Alcalde y no al Municipio. *Cf. De León v. Sria. de Instrucción,* 116 D.P.R. 687 (1985). No tenemos dudas de que procede tal imposición. El Alcalde Padilla fue temerario al litigar este caso sin ofrecer prueba robusta para siquiera rebatir la presunción de discrimen político. *Berríos Pagán v. U.P.R.,* 116 D.P.R. 88 (1985); *P.R. Amer. Ins. Co. v. Trib. Superior,* 100 D.P.R. 747, 749 (1972). Sin embargo, en las circunstancias de autos la cantidad resulta excesiva. Esta debe ser reducida a $10,000.

*Se dictará sentencia de conformidad.*

El Juez Presidente Señor Andréu García y el Juez Asociado Señor Fuster Berlingeri no intervinieron. El Juez Asociado Señor Negrón García emitió opinión escrita de conformidad en parte y disidente en parte.

---

[3] En el caso específico de Eduviges Rivera (hermano del ex Alcalde José (Nía) Rivera) el Negociado de Seguridad de Empleo emitió una resolución, concediéndole los beneficios de compensación por desempleo, en la que se determina que el patrono (Alcalde) no compareció a la vista a sostener que el empleado incurrió en conducta incorrecta en su trabajo.

— O —

Opinión de conformidad y disidente del Juez Asociado Señor Negrón García.

I

Estamos conformes con la Opinión del Tribunal, excepto en la parte VIII. No podemos suscribir este extremo que hoy, al caracterizar de intencionales y políticamente discriminatorios los despidos efectuados por el ex Alcalde Pedro A. Padilla Ayala, relega a la categoría de subsidiaria la responsabilidad de la sociedad legal de gananciales.

Dicha conclusión deja a los demandantes Orta *et al.* en un estado total de orfandad, sin posibilidades reales de eficazmente poder ejecutar la sentencia. Es evidente que el ex Alcalde Padilla Ayala *personalmente* no cuenta con fondos suficientes para satisfacer la condena sustancial de cientos de miles de dólares que conlleva.

Por otro lado, *en éste y otros casos futuros*, la conclusión de "intencional y discriminatoria" de este tipo de conducta claramente excluye la posibilidad de que el Estado, al amparo de la Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. sec. 3085, satisfaga dicha sentencia. El proceder del ex Alcalde Padilla Ayala, de su faz, es incompatible con el requisito de *buena fe* que debe existir para que se conceda esa protección económica.

II

No existe razón para relevar *a priori* a la sociedad legal de gananciales. En justicia, debimos balancear el interés de los perjudicados del discrimen y daño, asegurando suficiente fuente indemnizatoria para satisfacer la sentencia. Poner a disposición el peculio ganancial del funcionario público es la *única* alternativa que brinda la oportunidad de que podrá ejecutarse en su día. No podemos olvidar que

dicha sociedad legal es el régimen económico matrimonial predominante en Puerto Rico.

Finalmente, la imposición de responsabilidad a la sociedad de gananciales es el mejor disuasivo para que los funcionarios públicos no incurran en este tipo de acción discriminatoria. Inventario judicial: la sentencia, suscrita en "papel legal mojado", sin valor pecuniario alguno.