EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Sonia M. Vázquez Cintrón<br><br>        Recurrida<br><br>            v.<br><br>Banco de Desarrollo Económico<br>para Puerto Rico<br><br>        Peticionario | Certiorari<br><br>2007 TSPR 86<br><br>171 DPR _____ |

Número del Caso: CC-2005-1149

Fecha: 9 de mayo de 2007

Tribunal de Apelaciones:

            Región Judicial de San Juan Panel II

Juez Ponente:

            Hon. Troadio González Vargas

Abogado de la Parte Peticionaria:

            Lcdo. Enrique J. Mendoza Méndez

Abogados de la Parte Recurrida:

            Lcda. Yaritza Hernández Bonet
            Lcdo. José L. Colom Fagundo

Materia: Revisión Administrativa

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Sonia M. Vázquez Cintrón

      Recurrida

        v.                       CC-2005-1149

Banco de Desarrollo Económico
para Puerto Rico

      Peticionario

Opinión del Tribunal emitida por el Juez Asociado señor Rivera Pérez

San Juan, Puerto Rico, a 9 de mayo de 2007.

El caso de autos nos brinda la oportunidad de resolver si en la destitución de la Directora de la División de Préstamos Especiales y Recobros del Banco de Desarrollo Económico para Puerto Rico medió justa causa. El Banco la destituyó por incumplirle el pago de un préstamo cuya deuda ascendía a poco menos de medio millón ($500,000) de dólares ––en su capacidad de garantizadora personal y solidaria––, incurrir en conflicto de interés y deslealtad hacia la institución. Veamos los hechos que originan el presente recurso.

I

En el año 1995, Hecson de Puerto Rico, Inc., en adelante Hecson, corporación dedicada a la importación, venta, distribución y procesamiento de jugos, purés, pulpas y concentrados de fruta, atravesaba por una situación económica precaria. Buscando conjurarla, solicitó un préstamo al Banco de Desarrollo Económico para Puerto Rico, en lo sucesivo el Banco, por la cantidad de $500,000. La licenciada Sonia M. Vázquez Cintrón, en adelante licenciada Vázquez, en unión a su esposo, señor Héctor L. Andujar Ruiz, en lo sucesivo señor Andujar Ruiz, figuraban como incorporadores, y Secretaria y Presidente, respectivamente, de la referida corporación. El 27 de junio de 1995, el Comité de Crédito del Banco denegó la solicitud de préstamo porque Hecson no reflejaba habilidad de pago y su estructura de capital mostraba un alto grado de endeudamiento e insolvencia.

El 1 de septiembre de 1995, Hecson solicitó del Banco una reconsideración a la denegatoria de financiamiento empresarial, reduciendo su solicitud de préstamo a $300,000. El 1 de noviembre de 1995, el Comité de Crédito del Banco denegó nuevamente la solicitud, esencialmente, por las mismas razones en que descansó su denegatoria inicial.

Entre tanto, el 5 de septiembre de 1995, la licenciada Vázquez había sido contratada por el Banco, para que se desempeñara en calidad de Líder de Grupo de Asuntos Legales,

puesto incluido en su servicio de carrera, con un sueldo asignado de sobre $44,000 anuales.[1]

El 4 de enero de 1996, Hecson presentó en el Banco otra solicitud de reconsideración. En esta ocasión, le ofreció al Banco las **garantías colaterales o fuentes secundarias de repago que detallamos a continuación: (1) hipoteca en rango de tercera sobre el solar y residencia conyugal de la licenciada Vázquez y el señor Andujar Ruiz, (2) primera hipoteca sobre bienes muebles de la corporación --equipo y maquinaria--, (3) cesión, a favor del Banco, de las cuentas por cobrar de la corporación y (4) la firma, como deudores personales y solidarios, de la licenciada Vázquez y el señor Andujar Ruiz.**

Esta vez, **tomando en cuenta las referidas garantías, el Comité de Crédito del Banco aprobó el préstamo de $300,000.** Lo hizo el 19 de abril de 1996, con intereses a razón de 2% sobre la tasa preferencial anual, con un término de repago de 7 años, a base de 78 pagos mensuales escalonados y una moratoria inicial de 6 meses en el pago de principal.

Así, el 19 de abril de 1996, y conforme a los términos establecidos para la concesión del préstamo, **la licenciada Vázquez suscribió una "Carta de Garantía Personal" para garantizarlo solidariamente. También suscribió, en igual fecha, un contrato de préstamo en calidad de "Garantizadora Solidaria". Por último, ese mismo día, suscribió junto a su esposo, en calidad de deudores solidarios, un pagaré, a**

---

[1] Apéndice del recurso de *Certiorari*, pág. 193.

**favor del Banco, por la suma principal de $300,000.** La consideración y aprobación del préstamo se llevó a cabo sin intervención indebida de la licenciada Vázquez, que, en ese entonces, continuaba fungiendo como Líder de Grupo de Asuntos Legales del Banco.

Efectivo el 3 de marzo de 1997, la licenciada Vázquez fue seleccionada para ocupar un puesto en ascenso en el servicio de carrera del Banco. Se trató del puesto de Directora de Control de Calidad de Crédito. Éste conllevaba las funciones de planificar, dirigir y supervisar las actividades y procesos de verificación de crédito y financiamiento del Banco.

El 26 de marzo de 1997, estando en incumplimiento de pago, Hecson solicitó al Banco una moratoria adicional de 6 meses para el pago de principal e intereses del préstamo. No había hecho pago alguno a esa fecha. La moratoria fue aprobada por el Comité de Crédito del Banco.

No obstante, vencida la moratoria, Hecson continuó en incumplimiento de pago. Esta vez, decidió solicitar al Banco tres cosas: (1) otra moratoria de 6 meses para el pago de principal e intereses, (2) la reestructuración de su financiamiento --de acuerdo a la situación económica de la corporación en ese momento-- y (3) crédito adicional por $100,000. El Comité de Crédito del Banco aprobó la moratoria y la reestructuración solicitada, pero denegó el financiamiento adicional.

La licenciada Vázquez, en ese entonces Directora de Control de Calidad de Crédito del Banco, fungía también como Secretaria de su Comité de Crédito.[2] Sobre este particular, debemos destacar que, cuando en las reuniones del Comité de Crédito se discutía el incumplimiento del préstamo en cuestión, la licenciada Vázquez se inhibía de participar de la discusión.[3] Sin embargo, también es bueno apuntar que la licenciada Vázquez tenía conocimiento de tales discusiones, pues firmaba las minutas resultantes de las referidas reuniones. De hecho, la minuta de la reunión del Comité de Crédito del Banco en la que se aprobó la última moratoria y reestructuración del financiamiento brindado a Hecson, está firmada por la licenciada Vázquez.[4]

A pesar de todo lo anterior, en noviembre de 1997, Hecson cesó operaciones. El 9 de febrero de 1998, personal del Banco se reunió con el señor Andujar Ruiz para discutir el estatus de su cuenta y asuntos relacionados al cierre operacional de la corporación. En dicha reunión, el señor Andujar Ruiz confirmó el referido cierre y expresó que la reestructuración del financiamiento aprobada por el Banco era académica, primero, debido al cierre, y segundo, debido

---

[2] Fungió como Secretaria del Comité de Crédito desde marzo de 1997 hasta marzo de 2001, precisamente el tiempo que se desempeñó como Directora de Control de Calidad de Crédito del Banco.

[3] Apéndice del recurso de *Certiorari*, págs. 707-708 y 718.

[4] Íd., págs. 261, 288 y 295.

a que Hecson no tenía ingresos para cumplir con el compromiso que implicaba la mencionada reestructuración.[5]

El 23 de octubre de 1998, un acreedor hipotecario preferente sobre el solar y residencia conyugal de la licenciada Vázquez y el señor Andujar Ruiz, instó en el Tribunal de Primera Instancia una demanda de ejecución de hipoteca contra ambos y la sociedad legal de gananciales por ellos constituida. Aunque fueron emplazados, ni la licenciada Vázquez ni el señor Andujar Ruiz contestaron la demanda. Tampoco comparecieron posteriormente al procedimiento judicial. En fin, éste se llevó a cabo en rebeldía y la hipoteca fue efectivamente ejecutada y el bien inmueble adjudicado.

La licenciada Vázquez nunca informó a sus superiores la ejecución de una de las garantías o fuentes de repago en el préstamo concedido a Hecson. La ejecución y adjudicación del inmueble afectó los intereses del Banco, pues de éstas no resultó sobrante monetario alguno para abonar a la deuda prestataria.[6]

Por otro lado, el 25 de abril de 2000, el Banco presentó en el Tribunal de Primera Instancia una demanda de cobro de dinero y ejecución de hipoteca inmueble y mueble contra Hecson, la licenciada Vázquez, su esposo y la sociedad legal

---

[5] Íd., pág. 297.

[6] Determinación de hecho número trece (13), Resolución del Oficial Examinador, Apéndice del recurso de *Certiorari*, pág. 710.

de gananciales compuesta por ambos.[7]   La licenciada Vázquez

y su esposo fueron emplazados personalmente.   No obstante,

no  contestaron  la  demanda  ni  comparecieron  a  los

procedimientos judiciales.[8]   **El 8 de mayo de 2002, el**

**tribunal dictó sentencia en rebeldía, condenándolos al pago**

**solidario de $485,398.98, <u>más intereses a razón de $55.01</u>**

**<u>diarios hasta el saldo total de la deuda</u>**.[9]

El Banco no ha podido hacer efectiva la sentencia.  Según

indicamos antes, el Banco perdió la garantía hipotecaria que

tenía sobre el inmueble que constituyó el hogar conyugal de

la licenciada Vázquez y el señor Andujar Ruiz.  Igual suerte

corrió el gravamen que, a favor del Banco, pesaba sobre los

bienes muebles y cuentas por cobrar de Hecson.  De los unos

y  de  las  otras  se  dispuso  sin  el  consentimiento  de  la

institución bancaria.[10]

A la fecha en que se dictó la mencionada sentencia, la

licenciada Vázquez había sido designada por el Banco al

puesto de carrera de Directora de la División de Préstamos

Especiales  y  Recobros.[11]   Se  desempeñaba  precisamente  en

dicho puesto, cuando, el 27 de febrero de 2002, la señora

---

[7] Determinación de hecho número quince (15), Íd., pág. 710.

[8] Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de *Certiorari*, págs. 358-359.

[9] Íd., pág 363.

[10] Apéndice del recurso de *Certiorari*, págs. 297 y 367.

[11] Determinación de hecho dieciocho (18), Resolución del Oficial Examinador, Apéndice del recurso de *Certiorari*, pág. 715.

María M. Fuentes Pujols, en adelante señora Fuentes Pujols, --entonces Presidenta del Banco-- luego de ordenar una investigación interna y obtener sus resultados, le cursó una carta, formulándole cargos. En la carta, le informó que el Banco tenía la intención de destituirla. Le informó, además, que tenía **derecho a** solicitar la celebración de **una Vista Administrativa Informal de "pre-terminación de empleo".**[12]

En la formulación de cargos, se le imputó a la licenciada Vázquez incumplir, en su capacidad de garantizadora personal y solidaria, con el pago del préstamo en cuestión. También, se le imputó no honrar las garantías colaterales o fuentes secundarias de repago otorgadas por ella y su esposo al firmar el contrato de préstamo. Específicamente, se le imputó conocer o haber debido conocer, la venta de los bienes muebles de la corporación y la disposición de sus cuentas por cobrar, bienes y cuentas sobre las cuales existía un gravamen a favor del Banco. La señora Fuentes Pujols informó a la licenciada Vázquez que "su conducta es constitutiva de faltas que justifican su terminación de empleo".[13]

---

[12] Determinación de hecho veintitrés (23), Íd., pág. 710. Véase, además, carta de la señora María M. Fuentes Pujols, de 27 de febrero de 2002, Apéndice del recurso de *Certiorari*, pág. 367.

[13] Carta de la señora María M. Fuentes Pujols, de 27 de febrero de 2002, Apéndice del recurso de *Certiorari*, pág. 367.

La licenciada Vázquez ejercitó su derecho a la Vista Administrativa Informal de "pre-terminación de empleo". Ésta se celebró el 14 de marzo de 2002.[14] La licenciada Vázquez compareció a ella representada por abogado. Con posterioridad a su celebración, el 1 de abril de 2002, la señora Fuentes Pujols le cursó a la licenciada Vázquez una comunicación escrita en la que reafirmó los cargos imputados y le notificó su determinación de destituirla del puesto de carrera que ocupaba en el Banco, efectivo el 30 de abril de 2002.[15] También, le advirtió de su **derecho a** solicitar **una Vista Administrativa Formal Ante Un Oficial Examinador**. Al momento de su destitución, la licenciada Vázquez devengaba, como Directora de la División de Préstamos Especiales y Recobros, un salario mensual de $5,408.[16]

El 3 de mayo de 2002, la licenciada Vázquez presentó una querella formal ante la Junta de Directores del Banco. En ésta, **alegó que fue destituida sin justa causa, en violación a su derecho constitucional a un debido proceso de ley**.[17]

---

[14] Determinación de hecho veintiuno (21), Resolución del Oficial Examinador, Apéndice del recurso de *Certiorari*, págs. 714-715.

[15] Determinación de hecho veintidós (22), Íd., pág. 715. Véase, además, Sentencia del Tribunal de Apelaciones, Apéndice del recurso de *Certiorari*, pág. 7.

[16] Determinación de hecho veinticuatro (24), Resolución del Oficial Examinador, Apéndice del recurso de *Certiorari*, pág. 715.

[17] Sentencia del Tribunal de Apelaciones, Apéndice del recurso de *Certiorari*, pág. 8.

El 29 de mayo de 2002, el Banco contestó la querella. Designado el Oficial Examinador que presidiría la vista administrativa formal, finalmente, ésta se celebró durante los días 2 y 3 de diciembre de 2003 y 15 de marzo de 2004.

El 18 de octubre de 2004, el Oficial Examinador emitió una Resolución en la que declaró "con lugar" la querella presentada por la licenciada Vázquez. Determinó que el Banco la destituyó sin justa causa, en violación "a sus derechos como empleada del Banco y **contrario al principio de mérito**" (énfasis suplido).[18] Ordenó al Banco reinstalar inmediatamente a la licenciada Vázquez al puesto de carrera de Directora de la División de Préstamos Especiales y Recobros, y satisfacerle los salarios y beneficios marginales dejados de percibir desde la fecha de su destitución hasta el momento en que fuere reinstalada.[19]

Denegada por el Oficial Examinador una solicitud de reconsideración, el Banco presentó un Recurso de Revisión Administrativa ante el Tribunal de Apelaciones. El foro intermedio apelativo confirmó el dictamen recurrido y denegó al Banco una subsiguiente moción de reconsideración.

Inconforme, el Banco presentó ante nos un oportuno recurso de *Certiorari*, señalando los errores siguientes:

1. Erró el Tribunal de Apelaciones al confirmar al Hon. Oficial Examinador al concluir que no existía justa causa para el despido de la Lic. Vázquez.

---

[18] Resolución del Oficial Examinador, Apéndice del recurso de *Certiorari*, pág. 726.

[19] Íd.

2. Erró el Tribunal Apelativo al concluir que la Lic. Vázquez no incurrió en conflicto de intereses.
3. Erró el Tribunal Apelativo al concluir que la Lic. Vázquez no incurrió en conducta desleal.
4. Erró el Hon. Oficial Examinador al conceder los remedios otorgados.
5. Erró el Tribunal de Apelaciones al confirmar al Oficial Examinador y no disponer que el despido fue uno justificado.

El 3 de marzo de 2006, expedimos el recurso de *Certiorari*. Con el beneficio de la comparecencia de ambas partes, nos encontramos en posición de resolver.

## II

Por estar estrechamente relacionados, discutiremos los errores señalados conjuntamente.

### A. El Banco de Desarrollo Económico de Puerto Rico

El Banco de Desarrollo Económico de Puerto Rico, en adelante el Banco, es una instrumentalidad y corporación pública del Estado, creada por virtud de la Ley Núm. 22 de 24 de julio de 1985.[20] Dicha corporación **tiene como propósito de alto interés público la promoción del desarrollo del sector privado de la economía de Puerto Rico, haciendo disponible a cualquier persona, firma, corporación, sociedad, institución financiera, cooperativa u otra organización privada con o sin fines de lucro, préstamos directos, garantías de préstamos y fondos para invertir en**

---

[20] 7 L.P.R.A. sec. 611 *et seq.*

**dichas empresas, dando preferencia a los pequeños y medianos empresarios puertorriqueños.**[21]

El Banco tiene "personalidad legal propia y existencia separada del Estado Libre Asociado de Puerto Rico y de cualquiera de sus agencias, instrumentalidades o corporaciones públicas". Puede demandar y ser demandado. Sus "deudas, obligaciones, contratos, pagarés, recibos, gastos, cuentas, fondos, empresas y propiedades" son "de su única responsabilidad y no de la responsabilidad del Estado Libre Asociado de Puerto Rico, sus agencias, instrumentalidades y corporaciones públicas".[22] Sus negocios son administrados y sus poderes corporativos ejercidos por una Junta de Directores, compuesta por nueve (9) miembros, cinco (5) de los cuales son funcionarios públicos y cuatro (4), representantes del sector privado, nombrados por el Gobernador, con el consejo y consentimiento del Senado.[23]

**B. El Principio de Mérito**

**1. La Ley de Personal del Servicio Público**

En el sector de empleo público rige, como política pública, el principio de mérito.[24] El principio de mérito es y tiene como propósito que sean los más aptos los que sirvan al Gobierno y que todo empleado sea seleccionado,

---

[21] Íd., sec. 611a.

[22] Íd., secs. 611a y 611b.

[23] Íd., sec. 611d.

[24] López v. C.E.E., 2004 T.S.P.R. 47, 2004 J.T.S. 56, 161 D.P.R. __ (2004); Martínez Figueroa v. Oficina del Gobernador, 152 D.P.R. 586, 592 (2000); Rodríguez Román v.

adiestrado, ascendido **y retenido en su empleo** en consideración al mérito y a la capacidad, sin discrimen por razones de raza, color, sexo, nacimiento, edad, origen o condición social, ni por ideas políticas o religiosas, condición de veterano, ni por impedimento físico o mental.[25]

**La Ley de Personal del Servicio Público de 1975, según fuera enmendada**[26], en adelante antigua Ley de Personal de 1975, aplicable a los hechos del caso de marras, establecía en su **sección 10.6** que sus disposiciones no aplicaban a, entre otros, los empleados de agencias o instrumentalidades del Gobierno que funcionan como empresas o negocios privados, ni a los empleados de agencias o instrumentalidades del Gobierno que tengan derecho a negociar colectivamente.[27] Sin embargo, esa misma sección aclaraba que dichas agencias o instrumentalidades tenían que:

> **adoptar, con el asesoramiento de la Oficina de Personal, y dentro de los ciento veinte (120) días de la aprobación de esta ley, <u>un reglamento de personal incorporando el principio de mérito que regirá las normas de personal de aquellos</u>**

---

Banco Gubernamental de Fomento, 151 D.P.R. 383, 410 (2000); Reyes Coreano v. Director Ejecutivo, 110 D.P.R. 40 (1980).

[25] 3 L.P.R.A. sec. 1461, inciso 41; <u>Martínez Figueroa v. Oficina del Gobernador</u>, *supra*, pág. 596; <u>Rodríguez Román v. Banco Gubernamental de Fomento</u>, *supra*, pág. 410; <u>Reyes Coreano v. Director Ejecutivo</u>, *supra*, pág. 55.

[26] 3 L.P.R.A. ant. sec. 301 *et seq*. Esta ley fue derogada y sustituida por la vigente Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184 de 3 de agosto de 2004, según enmendada, 3 L.P.R.A. secs. 1461-1468p.

[27] 3 L.P.R.A. ant. sec. 1338.

**empleados no cubiertos por convenios colectivos** (énfasis añadido).[28]

Interpretando la referida sección 10.6 de la antigua Ley de Personal de 1975, destacamos en <u>Reyes Coreano v. Director Ejecutivo</u>, que:

> **[e]l mandato** a que se refiere el párrafo anteriormente transcrito, analizado **a la luz de los principios de política pública** proclamados con carácter general en la sección 2.1 de la ley [cita omitida], **revela sin duda la clara intención legislativa de efectuar la armónica instrumentación de uno de los principales objetivos de la ley:** <u>extender los beneficios de una administración de personal basada en el principio de mérito al mayor número posible de sectores públicos</u>. A esos fines **le impuso a dichas agencias la indefectible obligación de administrar su personal no unionado de conformidad con el principio de mérito,** aún cuando en atención a sus particulares circunstancias quedaran efectivamente excluidas de las restantes disposiciones de la ley. **Téngase presente en este sentido, que el principio de mérito existe únicamente en virtud de y de conformidad a como ha sido formulado en la Ley de Personal.**
>
> El historial de la medida confirma que fue ésta y no otra la intención legislativa. **Los antecedentes de la ley destacan la importancia que para sus objetivos representaba la reafirmación del principio de mérito como norma rectora en la administración de personal y su extensión de manera uniforme <u>a todos los sectores del servicio público</u>.** Así, el Informe Explicativo del anteproyecto propuesto por el Gobernador a la Asamblea Legislativa **advirtió claramente el propósito de extender el principio de mérito 'a todos los sectores del servicio público: empleados estatales -- <u>incluyendo los de las corporaciones públicas</u> -- empleados municipales** (énfasis suplido).[29]

---

[28] Íd.

[29] 110 D.P.R. 40, 47-48 (1980).

Más adelante, añadimos:

> Igualmente el Informe de las Comisiones de Gobierno y de Derechos Civiles del Senado al P. del S. 1428 afirma en la página 27 que '**el principio de mérito se hace extensivo <u>a todo el servicio público</u> de Puerto Rico (y no solamente a la tercera parte que ahora tiene esta protección)**' (énfasis nuestro).[30]

En el año 2000, hicimos extensivas estas expresiones al caso <u>Rodríguez Román v. Banco Gubernamental de Fomento</u>.[31] Allí, la parte demandada era el Banco Gubernamental de Fomento, **corporación pública creada con propósitos muy similares a los del Banco de Desarrollo Económico de Puerto Rico, esto es, fomentar la economía de Puerto Rico y especialmente su industrialización, proveyendo una fuente de financiamiento a personas naturales o jurídicas, dedicadas a la manufactura, al comercio, a la agricultura o al turismo, con énfasis en los medianos y pequeños comerciantes, mediante préstamos directos, garantías de préstamos, así como de inversiones de capital.**[32]

En <u>Rodríguez Román v. Banco Gubernamental de Fomento</u>, *supra*, expresamos que no obstante las exclusiones de varias ramas y agencias del Gobierno de las disposiciones de la antigua Ley de Personal de 1975, que obedecían, en el caso de las ramas, al respeto del principio de separación de

---

[30] Íd., págs. 48-49.

[31] 151 D.P.R. 383 (2000). Véase particularmente las páginas 410-411 de dicha Opinión.

[32] Íd., págs. 396 y 403-404.

poderes y, en el caso de la agencias, para evitar cualquier conflicto con los convenios colectivos que regían en las mismas, **"la política pública del Estado Libre Asociado ha sido la de extender el principio del mérito a todo el servicio público, incluso a las agencias e instrumentalidades excluidas por la mencionada ley de personal"** (énfasis añadido).[33]

Cabe destacar que los pronunciamientos que hemos hecho relativos a la política pública del Estado de extender el principio del mérito a todo el servicio público mantienen vigencia hoy, pues la sección 5.3 de la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184 de 3 de agosto de 2004, según enmendada,[34] en adelante nueva Ley de Personal de 2004, en términos muy similares a su antecesora, dispone que no será aplicable **"a las corporaciones o instrumentalidades públicas o público-privadas que funcionan como empresas o negocios privados"** (énfasis nuestro).[35]  Pero, adviértase que, igual que su antecesora, aclara y manda lo siguiente:

> [en] el caso de **las corporaciones públicas o público-privadas deberán adoptar reglamentos de personal que incorporen el principio de mérito a la administración de**

---

[33] Rodríguez Román v. Banco Gubernamental de Fomento, *supra*, págs. 411-412, citando a McCrillis v. Aut. Navieras de P.R., 123 D.P.R. 113, 132 (1989) y Reyes Coreano v. Director Ejecutivo, *supra*, pág. 47.

[34] 3 L.P.R.A. secs. 1461-1468p.

[35] 3 L.P.R.A. sec. 1461e.

> **sus recursos humanos, conforme lo dispone esta ley** (énfasis suplido).[36]

Por su parte, el artículo 4 de la ley habilitadora del Banco facultó a su Junta de Directores a promulgar políticas, reglamentos y procedimientos para disponer "de todos los asuntos del personal del Banco sin sujeción a la Ley Núm. 5 del 14 de octubre de 1975, conocida como 'Ley de Personal del Servicio Público de Puerto Rico'".[37] Es decir, la ley habilitadora del Banco (de 1985), en armonía con la antigua Ley de Personal de 1975 y la nueva Ley de Personal de 2004, establece que los empleados del Banco están efectivamente excluidos **de las disposiciones particulares** de la legislación de personal del servicio público.

**No obstante, ello nada tiene que ver con el mandato legal de que en el Banco rija**, **vía reglamento de personal, el principio de mérito**, de conformidad a como ha sido formulado en la citada legislación de personal.

**2. El Reglamento de Personal del Banco**

La licenciada Vázquez siempre fue, y hasta el momento de su destitución, una empleada regular del Banco, destacada en su servicio de carrera.[38] En todo momento, y durante el proceso de su destitución, los asuntos de personal de la corporación pública se rigieron por las disposiciones del **Reglamento de personal para empleados de carrera, confianza**

---

[36] Íd.

[37] 7 L.P.R.A. sec. 611b.

[38] Determinación de hecho del Oficial Examinador, Apéndice del recurso de *Certiorari*, págs. 704 y 706.

**y transitorios BDE-007 Núm. 5572 del Banco de Desarrollo Económico de Puerto Rico de 7 de mayo de 1997, en lo sucesivo Reglamento de Personal.**[39] Éste fue aprobado por la Junta de Directores del Banco allá para el 25 de marzo de 1997 y radicado en el Departamento de Estado el 7 de abril del mismo año.

La Base Legal del Reglamento de Personal, artículo 2, establece:

> **[e]ste reglamento se promulga en virtud de lo dispuesto en el artículo 4 de la Ley Núm. 22 del 24 de julio de 1985, conocida como la "Ley del Banco de Desarrollo Económico** para Puerto Rico", según enmendada, en **la disposición de la sección 10.6 de la Ley Núm. 5 del 14 de octubre de 1985, según enmendada, Ley de personal del Servicio Público y conforme a la Ley Núm. 170 del 12 de agosto de 1988, conocida como la Ley de Procedimiento Administrativo Uniforme** (énfasis añadido).

Por su parte, el artículo 3, titulado Propósito, de dicho cuerpo reglamentario dispone lo siguiente:

> **Se adopta este reglamento con el propósito de establecer las normas que regirán la administración de los Recursos Humanos en el Banco de Desarrollo Económico para Puerto Rico. <u>Se establece que el</u>**

---

[39] Este reglamento contenía normas aplicables "a los empleados del servicio de Carrera, del servicio de Confianza, empleados transitorios y aspirantes a empleo en el Banco", según reza textualmente su artículo 4, Alcance. En el año 2004, este reglamento fue anulado y sustituido por los siguientes: (1) Reglamento de recursos humanos del servicio de carrera BDE-014 Núm. 6783 del Banco de Desarrollo Económico de Puerto Rico de 2 de abril de 2004 y (2) Reglamento de recursos humanos del servicio de confianza BDE-015 Núm. 6784 del Banco de Desarrollo Económico de Puerto Rico de 2 de abril de 2004. De esta forma, se separaron en reglamentos distintos las normas de personal aplicables a los empleados de carrera, de las aplicables a los empleados de confianza. Éstos últimos dos (2) reglamentos son inaplicables a los hechos del presente caso.

> **principio de mérito será el concepto rector en la administración de los recursos humanos del Banco**, asegurando así que sean los más capacitados quienes sirvan al Banco y que los empleados sean seleccionados, adiestrados, ascendidos, **retenidos** y tratados en todo lo referente a su empleo en consideración única del **mérito** sin que medie discrimen por razones de raza, color, sexo, nacimiento, edad, origen o condición social, impedimentos ni por ideas políticas o religiosas (énfasis suplido).

De otro lado, su artículo 8 de Retención y Separación del Servicio, específicamente su sección 5, titulada Seguridad en el Empleo, afirma:

> **[l]os empleados regulares de Carrera tendrán continuidad en sus puestos**, siempre que satisfagan los criterios de **productividad, rendimiento, orden y disciplina** que deben prevalecer en el Banco (énfasis nuestro).

Asimismo, el Capítulo Cuarto del concernido reglamento, titulado Disciplina de Empleados, específicamente su artículo 19, Acciones Correctivas de Disciplina, sección 2, titulada Normas, inciso 18, indica lo siguiente: "[e]l Banco mantendrá unas guías de las acciones de disciplina para cada ofensa que se cometa".

Relacionado a las acciones de disciplina que el Banco puede tomar contra sus empleados, el Capítulo Cinco del Reglamento de Personal, titulado Quejas de Empleados, específicamente su artículo 20, **Procedimiento para Atender Quejas**, sección 3, establece un procedimiento **de cuatro (4) pasos, para considerar y adjudicar formalmente cualquier queja** de un empleado regular de carrera. Así lee el cuarto paso del referido procedimiento adjudicativo formal:

........
Paso 4: Si el empleado afectado aún no está satisfecho, éste deberá presentar una **querella formal** a la Oficina del Presidente [del Banco] en un término de treinta (30) días calendario contados a partir del recibo de la notificación que le hiciera el Vicepresidente de Recursos Humanos. **El Presidente, nombrará a un Oficial Examinador ajeno al Banco para que celebre una vista administrativa formal sobre la queja del empleado,** la cual **se llevará a cabo a tenor con el procedimiento que se dispone en la Ley 170 del 12 de agosto de 1988, según enmendada [Ley de Procedimiento Administrativo Uniforme, por sus siglas L.P.A.U.] y con el Procedimiento Administrativo ante un Oficial Examinador para Atender Querellas** que se haya aprobado.

**En la vista, el empleado tendrá derecho a estar representado legalmente, se tomará récord taquigráfico y el Oficial Examinador designado deberá realizar determinaciones de hecho y conclusiones de derecho.**

**El Oficial Examinador notificará la resolución administrativa** del caso, **a tenor con las Reglas de Procedimiento Administrativo Ante un Oficial Examinador,** aprobadas el 12 de junio de 1996 (énfasis suplido).

**3. El Reglamento de Procedimiento Administrativo Ante un Oficial Examinador**

Tal como lo expresa el transcrito "Paso 4" del Procedimiento para Atender Quejas, el Banco promulgó un reglamento titulado **Reglas de procedimiento administrativo ante un oficial examinador Núm. 5489 del Banco de Desarrollo Económico de Puerto Rico de 7 de noviembre de 1996.**[40]   La

---

[40] Este reglamento fue anulado y sustituido por el reglamento titulado Reglas de procedimiento administrativo ante un oficial examinador Núm. 7012 del Banco de Desarrollo Económico de Puerto Rico de 20 de agosto de 2005. Este último es inaplicable al caso de autos.

Regla 25 de este último reglamento, titulada Resoluciones y

Órdenes, específicamente la subregla 25.1, dispone que:

> **[l]a resolución** en los méritos <u>contendrá
> una relación de hechos probados,
> conclusiones de derecho, y</u> **dispondrá la
> orden que en derecho proceda** (énfasis
> añadido).

Asimismo, la Regla 26 del mencionado reglamento, titulada

Remedios, añade lo siguiente:

> 26.1 **Toda resolución otorgará el remedio
> que en derecho proceda** aún cuando las
> partes no lo hayan solicitado.
>
> 26.2 En los casos en que una de las partes
> haya actuado con temeridad, se impondrá el
> pago de honorarios de abogado e interés,
> conforme lo dispuesto en la Regla 44.1 (d)
> y 44.3 de Procedimiento Civil que se
> utiliza en los tribunales (énfasis
> nuestro).

Es menester señalar que, en su Regla 26, el referido

reglamento también establece el derecho a solicitar una

reconsideración ante el Oficial Examinador, de conformidad

con la Ley de Procedimiento Administrativo Uniforme del

Estado Libre Asociado de Puerto Rico (LPAU).[41]

Además, el reglamento en cuestión incluye, en su Regla

29, el derecho a revisión judicial, también conforme a la

LPAU. Expresa la referida regla que el escrito de revisión

judicial deberá presentarse en el Tribunal de Apelaciones,

conforme al reglamento de dicho tribunal, y en particular, a

tenor con las reglas relativas a la revisión de decisiones

administrativas.

---

[41] Ley Número 170 de 12 de agosto de 1988, según enmendada, 3
L.P.R.A. secs. 2101-2201.

**C. El derecho de retención como paradigma del principio de mérito: la reinstalación en el puesto como remedio**

Dentro del contexto del principio de mérito, la sección 4.6 de la antigua Ley de Personal de 1975 establecía lo siguiente:

> **[s]e proveerá <u>seguridad en el empleo a aquellos empleados de carrera</u>** que satisfagan los criterios de productividad, eficiencia, orden y disciplina que deben prevalecer en el servicio público (énfasis añadido).[42]

A la luz del concepto del principio de mérito, en <u>Rodríguez Román v. Banco Gubernamental de Fomento</u>, *supra*, interpretamos la citada sección y expresamos:

> **Paradigma de este principio es el <u>derecho de retención</u>, esto <u>es</u>, el de ser provisto de <u>seguridad en el empleo a aquellos empleados de carrera</u> idóneos, que satisfagan los requisitos de productividad y disciplina que deben prevalecer en el servicio público** (énfasis suplido).[43]

En relación a este particular, hemos resuelto que un empleado público de carrera tiene un reconocido y protegido interés legal en la retención de su empleo.[44] Es precisamente por ello que este tipo de empleado, con estatus regular, posee una expectativa de continuidad en el empleo,

---

[42] 3 L.P.R.A. ant. sec. 1336. En iguales términos está redactada la sección 6.6 de la nueva Ley de Personal de 2004, 3 L.P.R.A. sec. 1462e(1).

[43] Pág. 410 de la Opinión.

[44] <u>Orta v. Padilla Ayala</u>, 131 D.P.R. 227, 241 (1992); <u>Torres Solano v. P.R.T.C.</u>, 127 D.P.R. 499 (1990); <u>Pierson Muller I v. Feijoó</u>, 106 D.P.R. 838, 852 (1978).

que forma parte de su derecho de propiedad, de lo cual no puede ser privado sin que medie debido proceso de ley.[45]

No obstante, mucho más pertinentes y penetrantes al presente caso son nuestras expresiones en <u>Carrón Lamoutte v. Compañia De Turismo.</u>[46] Como sabemos, tanto la Compañía de Turismo, como el Banco Gubernamental de Fomento de Puerto Rico y el Banco de Desarrollo Económico de Puerto Rico, son corporaciones públicas excluidas de la legislación de personal del servicio público. Con ello en mente, veamos lo que allí expresamos:

> Al evaluar la controversia de autos recordemos que **la Compañía de Turismo es "una corporación pública e instrumentalidad gubernamental del Estado Libre Asociado",** <u>**23 L.P.R.A. sec. 671a**</u>**, excluida del sistema de personal del servicio público. Sin embargo, en conformidad con la Sec. 10.6 de la Ley de Personal del Servicio Público de Puerto Rico,** <u>**3 L.P.R.A. sec. 1338(3)**</u> **y (4), la Compañía de Turismo adoptó un reglamento de personal que extendió el principio de mérito a los empleados no cubiertos por convenio colectivo.**
> **El Reglamento de Personal de la Compañía de Turismo** de Puerto Rico establece dos (2) categorías de empleados y **dispone un procedimiento para el reclutamiento, ascenso, destitución y cesantía según su capacidad y bajo el principio de mérito. Mediante este ordenamiento, los empleados de carrera adquirieron un reconocido interés propietario en la retención de su empleo. Una vez se le reconoció ese derecho, el Estado no puede privárselo sin unas garantías**

---

[45] <u>Orta v. Padilla Ayala</u>, *supra*, pág. 241; Art. II, sec. 7, Const. E.L.A., L.P.R.A., Tomo 1; Emdas. V y XIV, Const. EE.UU., L.P.R.A., Tomo 1; <u>Torres Solano v. P.R.T.C.</u>, *supra*.

[46] 130 D.P.R. 70 (1992).

> **procesales que cumplan con el debido proceso de ley.**
>
> ........
>
> **Bajo esta normativa, y considerando nuestros pronunciamientos en <u>Torres Solano v. P.R.T.C.</u>,** *supra*, **los empleados de carrera de la Compañía de Turismo están protegidos por la cláusula constitucional del debido proceso de ley** (subrayado en el original y negritas nuestras).[47]

Consistente con todo lo anterior, hemos expresado que el principio de mérito es uno integral que cubre tanto la selección del empleado como su destitución.[48] Así, en los casos de destitución de un empleado público de carrera, si la decisión resultante del proceso adjudicativo administrativo es favorable al empleado, hemos resuelto que <u>lo que procede es</u> **"ordenar su restitución y el pago total, o parcial, de los salarios dejados de percibir por éste desde la fecha de efectividad de la destitución, más los beneficios marginales a que hubiese tenido derecho"** (énfasis suplido).[49]

Finalmente, hacemos hincapié en que hemos reconocido estos mismos remedios a los empleados de carrera que laboran en corporaciones públicas excluidas de la legislación de

---

[47] Íd., págs. 81-82.

[48] <u>Martínez Figueroa v. Oficina del Gobernador</u>, *supra*, pág. 596.

[49] <u>Hernández Badillo v. Municipio de Aguadilla</u>, 154 D.P.R. 199, 203-204 (2001). Véase, además, <u>Estrella v. Municipio de Luquillo</u>, 113 D.P.R. 617 (1982) y <u>Navedo v. Municipio de Barceloneta</u>, 113 D.P.R. 421 (1982). En éstos últimos dispusimos que para vindicar un despido ilegal de un empleado de carrera cobijado por el principio de mérito, lo que procede es la reposición en el puesto con la paga del sueldo dejado de percibir.

personal del servicio público, que han adoptado el principio

de mérito vía sus respectivos reglamentos de personal.[50]

## D. Mecanismo de revisión judicial

El Artículo 4.006 de la Ley de la Judicatura del Estado

Libre Asociado de Puerto Rico de 2003 dispone que:

> El Tribunal de Apelaciones conocerá de
> los siguientes asuntos:
>
> (a) ...
>
> (b) ...
>
> (c) Mediante recurso de revisión
> judicial, que se acogerá como cuestión
> de derecho, de las decisiones, órdenes
> y resoluciones finales de los
> organismos o agencias administrativas.
> En estos casos, la mera presentación
> del recurso no paralizará el trámite
> en el organismo o agencia
> administrativa ni será obligatoria la
> comparecencia del Estado Libre
> Asociado ante el foro apelativo a
> menos que así lo determine el
> tribunal. El Procedimiento a seguir
> será de acuerdo con lo establecido por
> la Ley Núm. 170 de 12 de agosto de
> 1988, según enmendada, conocida como
> la "Ley de Procedimiento
> Administrativo Uniforme del Estado
> Libre Asociado de Puerto Rico".[51]

Bajo el casi idéntico lenguaje del artículo 4.002(g) de

la derogada Ley de la Judicatura de 1994[52], hemos resuelto

que el Tribunal de Apelaciones es el foro con competencia

para entender en la revisión de una determinación final de

---

[50] Carrón Lamoutte v. Compañia De Turismo, *supra*, pág. 88.
Véase, además, nuestras expresiones en Camacho v. AAFET,
2006 T.S.P.R. 88, 2006 J.T.S. 97, 168 D.P.R. __ (2006).

[51] Ley Núm. 201 de 22 de agosto de 2003, 4 L.P.R.A. sec.24 y.

[52] 4 L.P.R.A. ant. sec. 22k(g).

un Oficial Examinador agencial, en el contexto administrativo interno de la destitución de un empleado cobijado por el principio de mérito, destacado en una entidad excluida de la legislación de personal del servicio público, y cuyo reglamento de personal y reglamento para revisar acciones de personal facultan al Tribunal de Apelaciones para así hacerlo.[53]

**E. Conclusión**

El análisis integral de lo expresado hasta aquí nos lleva a concluir inexorablemente lo siguiente. El Banco es una corporación pública excluida de la legislación de personal del servicio público, pero que, en cumplimiento de un mandato legislativo, incorporó en sus reglamentos de personal y para revisar acciones de personal, el principio de mérito. Al nombrar a la licenciada Vázquez empleada regular de carrera, le otorgó, a tenor con dichos reglamentos, seguridad de empleo, y por ende, derecho propietario sobre su puesto. Por ello, sólo podía ser destituida previa formulación de cargos, vista y justa causa, es decir, con el debido proceso de ley.

La Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como Ley de Indemnización por Despido Injustificado[54], no tiene lugar en la controversia de marras porque la licenciada Vázquez, como empleada regular en el servicio de carrera del Banco, gozaba de una mayor y más

---

[53] López v. C.E.E., 2004 T.S.P.R. 47, 2004 J.T.S. 56, 161 D.P.R. ___ (2004).

completa protección bajo el manto del principio de mérito, según lo conocemos. La Ley Núm. 80, *supra*, sólo provee como remedio a los empleados despedidos injustificadamente una compensación económica, comúnmente conocida como mesada. Sin embargo, de haber sido destituida sin justa causa, la licenciada Vázquez tenía derecho a reinstalación en su puesto, con la paga de los salarios y beneficios marginales dejados de percibir hasta la fecha de su reposición. Como cuestión de realidad, esos remedios le fueron provistos por el Oficial Examinador que presidió la vista administrativa formal de destitución, y fueron confirmados por el Tribunal de Apelaciones.

Finalmente, destacamos que la determinación que sobre su destitución hizo el Oficial Examinador designado por el Banco, sólo era revisable a la luz de las normas que nuestro ordenamiento legal provee (según vimos, incorporadas en la reglamentación de personal del Banco) para objetar decisiones administrativas.

### III

Aclarado lo anterior, procede que pasemos a la cuestión central del caso de autos, esto es, revisar la Sentencia del Tribunal de Apelaciones, confirmatoria de la decisión del Oficial Examinador designado por el Banco, al efecto de que el Banco destituyó sin justa causa a la licenciada Vázquez.

---

[54] 29 L.P.R.A. sec. 185a *et seq.*

Lo haremos a la luz del estándar de revisión de determinaciones administrativas.

La LPAU dispone que las determinaciones de hecho de las agencias serán sostenidas por los tribunales si se basan en evidencia sustancial que obre en el expediente administrativo[55]; siendo evidencia sustancial aquella que una mente razonable podría aceptar como adecuada para sostener una conclusión.[56] "Lo anterior, pretende 'evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor'".[57]

Sin embargo, las conclusiones de derecho de los organismos administrativos que no involucran interpretaciones efectuadas dentro del ámbito de especialización de la agencia concernida, son revisables en toda su extensión.[58]

Así las cosas, "los tribunales se abstendrán de avalar o deferir a la interpretación de la agencia si ésta: (1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente; o (3) lesionó derechos constitucionales

---

[55] Sección 4.5 de la Ley Núm. 170, *supra*, 3 L.P.R.A. sec. 2175.

[56] Mun. De San Juan v. Junta de Planificación, 2006 T.S.P.R. 155, 2006 J.T.S. 164, 169 D.P.R. __ (2006). Véase, además, Hernández v. Centro Unido, 2006 T.S.P.R. 131, 168 D.P.R. ___ (2006), citando a Otero v. Toyota, 2005 T.S.P.R. 8, 2005 J.T.S. 13, 163 D.P.R. ___ (2005).

[57] Mun. De San Juan v. Junta de Planificación, *supra*; Hernández v. Centro Unido, *supra*.

[58] Íd.

fundamentales".[59]  En otras palabras, la deferencia judicial a la determinación administrativa cede ante una actuación irrazonable o ilegal.[60]  "Los tribunales no estamos llamados a imprimir un sello de corrección, so pretexto de deferencia, para avalar situaciones en que la interpretación de la agencia resulte contraria a derecho".[61]

En el presente caso, el Oficial Examinador determinó como hecho probado que la licenciada Vázquez, junto a su esposo, garantizaron solidaria y personalmente el préstamo de $300,000 que el Banco extendió a Hecson Puerto Rico, Inc. (Hecson), incorporada y dirigida, precisamente, por su empleada, la licenciada Vázquez, y su esposo.  Además, que para convencer al Banco a aprobar el financiamiento, además de la garantía solidaria y personal ofrecida por los esposos, éstos ofrecieron varias garantías o fuentes de repago adicionales, a saber: (1) hipoteca en rango de tercera sobre el solar y residencia conyugal, (2) primera hipoteca sobre bienes muebles de la corporación --equipo y maquinaria-- por $206,000, y una (3) cesión de cuentas por cobrar de la corporación a favor del Banco.  Fue tomando en cuenta las garantías colaterales o fuentes secundarias de

---

[59] Íd.

[60] Íd.  Véase, además, T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70 (1999); Com. Seg. P.R. v. Antilles Ins. Co., 145 D.P.R. 226 (1998); Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020 (1992); Rivera v. A & C Development Corp., 144 D.P.R. 450 (1977).

[61] Mun. De San Juan v. Junta de Planificación, supra; A.A.A. v. Unión Abo. A.A.A., 2002 T.S.P.R. 149, 2002 J.T.S. 155, 158 D.P.R.___(2002); Calderón v. Adm. Sistemas de Retiro, supra.

repago ofrecidas, que el Comité de Crédito del Banco finalmente aprobó la transacción. Determinó, además, que la recurrida no intervino indebidamente en la aprobación del préstamo por parte de su patrono. También, que luego de su aprobación, el Banco la ascendió en dos (2) ocasiones, siendo su último puesto el de Directora de la División de Préstamos Especiales y Recobros. Incluso, que la licenciada Vázquez fue miembro del Comité de Crédito del Banco desde marzo de 1997 hasta marzo de 2001. Era su Secretaria.

Por otro lado, se desprende de las determinaciones de hecho del Oficial Examinador que el incumplimiento con el pago del préstamo llevó al Banco, a solicitud de Hecson, a otorgarle dos (2) moratorias adicionales en el pago de principal e intereses, en lo que no intervino la licenciada Vázquez. Sin embargo, el Oficial Examinador determinó que en noviembre de 1997, Hecson cerró operaciones, y no fue sino en febrero de 1998 que el esposo de la licenciada Vázquez (no ella) lo informó al Banco.

De otra parte, de las determinaciones de hechos del Oficial Examinador surge que un acreedor preferente ejecutó su hipoteca sobre el solar y residencia de la licenciada Vázquez y su esposo. El procedimiento de ejecución se efectuó en rebeldía, pues, a pesar de haber sido emplazados, ni la licenciada Vázquez ni su esposo contestaron la demanda ni comparecieron a los procedimientos. La licenciada Vázquez nunca informó al Banco la ejecución de una de sus garantías o fuentes de repago en el préstamo concedido a

Hecson.  De dicha ejecución no resultó sobrante alguno para abonar a la acreencia del Banco.

Por otro lado, de las determinaciones de hechos del Oficial Examinador se desprende que la licenciada Vázquez tampoco informó al Banco que, además de la hipoteca inmueble, éste había perdido las garantías colaterales de hipoteca sobre bienes muebles y sobre las cuentas por cobrar de Hecson.  La corporación dispuso de los unos y de las otras, sin consentimiento del Banco.  En síntesis, Hecson no realizó pago alguno acreditable a la deuda.  Los garantizadores personales y solidarios del préstamo --la licenciada Vázquez y su esposo-- tampoco hicieron pago alguno acreditable a la cuenta.  Asimismo, el Banco se vio imposibilitado de cobrar su acreencia a través de sus otras garantías colaterales.

Finalmente, surge de las referidas determinaciones de hechos que el Banco se vio en la obligación de demandar en cobro del préstamo impagado a su Directora de la División de Préstamos Especiales y Recobros, y Secretaria de su Comité de Crédito, es decir, a la licenciada Vázquez.  También, a su esposo y a Hecson, de quien, como sabemos, la licenciada Vázquez era incorporadora y directora.  Se desprende, además, que la licenciada Vázquez y su esposo fueron emplazados personalmente y tampoco contestaron la demanda ni comparecieron a los procedimientos.  El Tribunal de Primera Instancia terminó dictando sentencia en rebeldía contra la licenciada Vázquez y su esposo, en carácter solidario, por

la suma de **$485,398.98, <u>más intereses a razón de $55.01 diarios hasta el saldo total de la deuda</u>**.

El Oficial Examinador determinó que el Banco destituyó a la licenciada Vázquez por haber incumplido con el pago del préstamo del cual ella era garantizadora personal y solidaria, y por serle imputable el incumplimiento de Hecson, que vendió y dispuso de los bienes muebles y cuentas por cobrar de la corporación, grabados a favor del Banco. Todo ello con el resultado de la pérdida para el Banco de una cuenta de poco menos de medio millón ($500,000) de dólares.

No obstante, el Oficial Examinador concluyó, como cuestión de derecho, que la destitución de la licenciada Vázquez fue sin justa causa. Se basó, esencialmente, en que su obligación como deudora, su incumplimiento de pago, la ausencia de acciones afirmativas de su parte en protección de los intereses del Banco --en cuanto al préstamo se refiere-- y sus actuaciones contrarias a tales intereses, nada tenían que ver con sus ejecutorias como empleada, es decir, como Directora de la División de Préstamos Especiales y Recobros del Banco. Además, apoyó su decisión en el hecho de que en el proceso de aprobación del préstamo a Hecson, la licenciada Vázquez no violó la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, en lo sucesivo Ley de Ética Gubernamental[62], ni la ley habilitadora del Banco.

_____

[62] Ley Núm. 12 de 24 de Julio de 1985, según enmendada, 3 L.P.R.A sec. 1801 *et seq*.

Concluyó que todo lo anterior, en unión a que la licenciada Vázquez cumplía con los deberes de su puesto, y que no intervino indebidamente ni en la aprobación del préstamo ni en la concesión de sus moratorias de pago, hacían de su destitución una sin justa causa.

Por su parte, el Tribunal de Apelaciones, luego de citar *in extenso* la Resolución del Oficial Examinador, confirmó su decisión.   Erraron ambos como cuestión de derecho.   El problema no radicó en la etapa de la perfección del préstamo en controversia sino en la etapa del cumplimiento de su pago, vista desde la perspectiva de los puestos que ocupaba la licenciada Vázquez en el Banco.   Veamos.

Las Guías para Acciones Correctivas de Disciplina, que forman parte del Procedimiento para Aplicar Acciones Correctivas de Disciplina del Banco[63], **disponen que ocultar información que afecte al Banco conlleva la sanción de destitución a la primera falta.**[64]

Por otro lado, establecen que incurrir en actuaciones que envuelvan conflicto de intereses con sus obligaciones en el Banco conlleva las siguientes sanciones: en una primera falta, entre un mínimo de una reprimenda escrita y un máximo de una suspensión de empleo y sueldo por 15 días; en una segunda infracción, entre un mínimo de una suspensión de empleo y sueldo de 15 a 30 días y un máximo de destitución.

---

[63] Aprobado por su Junta de Directores el 13 de mayo de 1997, entrando en vigor el 13 de junio de 1997.   Apéndice del recurso de *Certiorari*, págs. 120-128.

[64] Apéndice del recurso de *Certiorari*, pág. 127.

Finalmente, disponen que violar la Ley de Ética Gubernamental y sus reglamentos, o cualquier otra disposición relacionada a la ética de los empleados públicos conlleva las sanciones siguientes: en una primera falta, entre un mínimo de una reprimenda verbal y un máximo de una reprimenda escrita; en una segunda infracción, entre un mínimo de una reprimenda escrita y un máximo de una suspensión de empleo y sueldo de 1 a 15 días; en una tercera falta, entre una suspensión de empleo y sueldo de 1 a 30 días y un máximo de destitución.[65]

No albergamos dudas de que la licenciada Vázquez incurrió en ambas faltas. No obstante, somos del criterio de que **es la unión de las mismas, a su patrón de ocultar información que afectaba al Banco**, lo que constituyó justa causa para su destitución. **Nótese que las referidas Guías sí contemplan la destitución ante ésta última falta.**

En torno a ocultar información que afecta al Banco, como falta, resaltamos lo siguiente. El verbo "ocultar" es definido como "esconder, tapar, disfrazar, encubrir a la vista; callar advertidamente lo que se pudiera o debiera decir, o disfrazar la verdad".[66]

La licenciada Vázquez le representó al Banco que garantizaba solidaria y personalmente el cumplimiento del préstamo concedido a Hecson. A sabiendas del craso

---

[65] Íd., págs., 127-128.

[66] Diccionario de la Lengua Española, 22da ed., Madrid, Ed. Espasa-Calpe, 2001, T.I., pág. 1609.

incumplimiento de pago de Hecson, nunca hizo abono alguno a la deuda en su carácter personal de garantizadora solidaria.

Tampoco tomó iniciativa alguna dirigida a pagar, aunque sea por medio de un plan de pago. Llama la atención que al momento de su destitución, su salario mensual era de $5,408.[67] Sin embargo, no se inmutó en lo absoluto. En ese sentido, es claro e indiscutible que le incumplió a su patrono. Miró para el lado, y se hizo la desentendida.

Por otro lado, la licenciada Vázquez nunca informó al Banco que la corporación que junto a su esposo dirigió cesó operaciones prácticamente en el mismo tiempo en que el Comité de Crédito del Banco le estaba otorgando una segunda moratoria en el pago de principal e intereses. Recordemos que la licenciada Vázquez era miembro de dicho Comité. Tampoco tuvo la iniciativa de informar a sus superiores que un acreedor preferente estaba ejecutándole su residencia conyugal, que constituía una de las garantías del préstamo en cuestión. El mismo *modus operandi* exhibió en relación con los bienes muebles y cuentas por cobrar de Hecson, que ella y su esposo, como sus directores, decidieron gravar, a favor del Banco, en garantía adicional del préstamo. La empresa, que obviamente actúa a través de sus dirigentes, dispuso de éstas otras dos (2) garantías colaterales, y ella, independientemente de si participó o no directamente de dicho proceder, cuanto menos, no lo informó a su patrono. Por tanto, también es claro que la licenciada Vázquez

incurrió en conducta desleal, de ocultamiento y encubrimiento, que perjudicó los intereses de su patrono. Protegió los suyos, más no los del Banco ni los del Pueblo de Puerto Rico, quien en todo caso, es el último afectado por la situación.

De otra parte, la Ley de Ética Gubernamental define conflicto de intereses como aquella situación en la que el interés personal o económico del empleado público o de personas relacionadas con éste, está o puede razonablemente estar en pugna con el interés público.[68] Dicha ley proscribe incurrir en ese tipo de conducta.[69] Según vimos, mediante las Guías de Acciones Correctivas de Disciplina, *supra*, el Banco incorporó la referida prohibición, pues, prescriben que un empleado no puede actuar en conflicto de interés con sus obligaciones en el Banco.

La licenciada Vázquez era miembro del Comité de Crédito del Banco y Directora de su División de Préstamos Especiales y Recobros. Por un lado, compartía la responsabilidad de evaluar, entre otras, las solicitudes de préstamos y de moratorias de pago que llegaban al Banco. Por el otro, tenía a su cargo atajar la morosidad y recobrar para el Banco el dinero adeudado por los clientes morosos. No obstante, nunca pagó su propia deuda con el Banco ni hizo intento o gestión afirmativa de clase alguna para hacerlo.

---

[67] Apéndice del recurso de *Certiorari*, pág. 415.

[68] Artículo 1 de la Ley Núm. 12, *supra*, 3 L.P.R.A sec. 1802.

[69] Artículo 3.2 de la Ley Núm. 12, *supra*, 3 L.P.R.A sec. 1802.

Peor aún, su incumplimiento obligó al Banco a demandarla en cobro de dinero y su reacción ante ello fue ignorar el procedimiento judicial, por lo que el tribunal tuvo que dictar en su contra una sentencia en rebeldía.

Nos preguntamos, ¿con qué fuerza moral la licenciada Vázquez podía exigir a los miembros de la División que ella dirigía que cobraran diligentemente las cuentas de los clientes morosos del Banco, si ella se burlaba de éste debiéndole casi medio millón ($500,000) de dólares? Hiere la retina la situación de conflicto de interés en la que estaba inmersa la licenciada Vázquez como funcionaria de alta jerarquía del Banco. Antepuestos estaban sus intereses personales a los del Banco y los del Pueblo de Puerto Rico. Se había recostado de su alta posición en el Banco para incumplirles.

En fin, la licenciada Vázquez incurrió, a la misma vez, en tres (3) faltas listadas por el Banco en las Guías de Acciones Correctivas de Disciplina, *supra*, una (1) de las cuales conllevaba su destitución. Erró el Tribunal de Apelaciones al confirmar la determinación del Oficial Examinador designado por el Banco en este caso. Su Sentencia debe ser revocada.

IV

Por los fundamentos antes expuestos, concluimos que en la destitución de la recurrida medió justa causa y revocamos la Sentencia del Tribunal de Apelaciones que dispuso lo contrario.

Se dictará Sentencia de conformidad.


*Efraín E. Rivera Pérez*
*Juez Asociado*

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Sonia M. Vázquez Cintrón

     Recurrida

       v.                  CC-2005-1149

Banco de Desarrollo Económico
para Puerto Rico

     Peticionario

SENTENCIA

San Juan, Puerto Rico, a 9 de mayo de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integra de la presente, concluimos que en la destitución de la recurrida medió justa causa.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió Opinión Concurrente. La Jueza Asociada señora Rodríguez Rodríguez no intervino.

                  Aida Ileana Oquendo Graulau
                  Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Sonia M. Vázquez Cintrón

    Recurrida


        vs.                        CC-2005-1149
Certiorari


Banco de Desarrollo Económico
para Puerto Rico

    Peticionario


Opinión Concurrente emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.


San Juan, Puerto Rico, a 9 de mayo de 2007.


El caso de autos presenta la ocasión para examinar la situación normativa respecto al Banco de Desarrollo Económico de Puerto Rico, a los fines de determinar lo pertinente a la facultad para despedir a sus empleados.

Para ello emitimos la Opinión de autos, formulada con anterioridad a la mayoritaria.

I.

La compañía Hecson de Puerto Rico (en adelante Hecson) inició operaciones en el año 1992. Sonia Vázquez Cintrón, abogada de profesión, (en adelante la recurrida o Vázquez) y Héctor L. Andujar

Ruiz, quienes estaban casados entre sí para esa fecha, figuraron como los incorporadores de dicha empresa.

Para el año 1995 Hecson se encontraba en una situación económica precaria, razón por la cual presentó una solicitud de préstamo al Banco de Desarrollo Económico de Puerto Rico (en adelante el Banco o el peticionario) por la suma de $500,000. La solicitud de préstamo promovida por Hecson fue considerada por el Comité de Crédito Gerencial del Banco, que eventualmente la denegó, debido a que los estados financieros sometidos por la compañía reflejaban que la rentabilidad de las operaciones de Hecson iban en descenso, la estructura de deuda de la empresa presentaba un cuadro serio de insolvencia y la propiedad ofrecida como colateral se encontraba gravada por dos hipotecas previas.

Posteriormente, en septiembre de ese mismo año, la recurrida comenzó a laborar en el Banco ocupando el puesto de Líder de Grupo en la División Legal.[70] Ese mismo mes, Hecson sometió al Banco una solicitud de reconsideración a la denegatoria de su solicitud de préstamo original. A tales fines redujo la cantidad solicitada a $300,000. Dicha solicitud fue nuevamente denegada por las mismas razones y fundamentos en que descansó la denegatoria original.

---

[70] Al iniciar sus labores en el Banco, la recurrida juró ante notario público el juramento de fidelidad y de toma de posesión de su cargo. De dicho juramento emanan obligaciones de total fidelidad al cargo ocupado.

En enero de 1996 Hecson sometió una segunda solicitud de reconsideración a la denegatoria de su solicitud de préstamo. En esta ocasión aumentó las garantías ofrecidas, añadiendo como fuente secundaria de repago una hipoteca sobre la maquinaria del negocio, una cesión de cuentas por cobrar y una tercera hipoteca sobre la residencia de los esposos incorporadores. Tanto la recurrida como Andujar se comprometieron a garantizar solidariamente el préstamo. Contando con estas garantías adicionales, el Comité de Crédito Gerencial aprobó el préstamo solicitado por la cantidad de $300,000 con intereses a razón de 2% sobre la tasa preferencial anual. Conforme a los términos establecidos para la concesión del referido préstamo, el 19 de abril de 1996 la recurrida suscribió una Carta de Garantía Personal para garantizar solidariamente el préstamo otorgado por el Banco a favor de Hecson. También suscribió el contrato de préstamo otorgado en igual fecha en calidad de "Garantizadora Solidaria", así como un pagaré por la suma principal de $300,000 a favor del Banco, suscrito igualmente como garantizadora.

Posteriormente, en el año 1997, la recurrida fue ascendida en el Banco a ocupar la plaza de Directora de Control de Calidad de Crédito y más tarde, en marzo de 2001, pasó a ocupar el puesto de Directora de la División Interina de Préstamos Especiales y Recobro del Banco.

El préstamo de $300,000 desembolsado a Hecson no fue suficiente para resolver su difícil situación financiera,

por lo que la empresa solicitó dos moratorias en el pago del principal e intereses, las cuales fueron concedidas. Aun así, durante el mes de noviembre de 1997 Hecson cerró operaciones de forma permanente. Tanto la compañía, como la recurrente y su esposo, incumplieron crasamente con los términos del contrato de préstamo. Ninguno de ellos realizó pago alguno para acreditar a la deuda. La hipoteca que gravaba la propiedad dada en garantía fue ejecutada por un acreedor preferente y vendida en pública subasta, no resultando de dicha venta sobrante alguno que abonar a la acreencia del Banco. Parte de la maquinaria y equipo que servía de colateral en el préstamo fue vendido sin el consentimiento del Banco y otra parte fue desechada por alegadamente estar defectuosa. Por consiguiente, el Banco no pudo cobrar absolutamente nada de su acreencia.

Ante la falta de pago del préstamo, en abril del año 2000 el Banco presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda de cobro de dinero y ejecución de hipoteca mueble e inmueble por la vía ordinaria.[71] Figuraron como demandados en dicho caso la empresa Hecson, así como los esposos garantizadores, la recurrida y su esposo, y la Sociedad Legal de Gananciales integrada por ambos. Ninguno de los demandados compareció a los procedimientos del Tribunal a pesar de haber sido debidamente emplazados, por lo que el 8 de mayo de 2002 se procedió a dictar sentencia en rebeldía en su

---

[71] Banco de Desarrollo Económico para Puerto Rico v. Hecson de Puerto Rico, et als., Civil Núm.: KCD2000-0219.

contra. Mediante dicha Sentencia, se condenó a ambos demandados, por sí y en representación de la Sociedad Legal de Gananciales integrada por ellos, a satisfacer solidariamente la suma de $485,398.98, más intereses a razón de $55.01 diarios hasta el saldo de la deuda. La recurrida nunca realizó acto afirmativo alguno por satisfacer su obligación a pesar de ser garantizadora solidaria del préstamo y de tener una sentencia judicial en su contra.

Considerando todas las circunstancias del caso, y luego de haber ordenado la realización de una investigación interna sobre los hechos aquí expuestos, María M. Fuentes Pujols, quien para ese momento fungía como Presidenta del Banco, le remitió una carta a Vázquez en la cual le señalaba el balance adeudado por Hecson y su condición de garantizadora de dicha deuda. Fuentes Pujols concluyó la carta informándole su intención de despedirla, así como el derecho que le asistía a una vista informal o de pre-terminación de empleo y el término para ejercitarlo; derecho que la recurrida ejerció. Posteriormente, en abril de 2002, la Presidenta del Banco le informó mediante carta a Vázquez su decisión de despedirla del puesto de carrera que ocupaba.

Por razón del despido, la recurrida presentó una Querella Formal ante la Junta de Directores del Banco, en la que alegó haber sido despedida injustificadamente. Solicitó la celebración de una vista administrativa

formal, la cual se le concedió y fue presidida por el Oficial Examinador, Hon. Ángel F. Rossy García. Por su parte, el Banco alegó que el despido de la recurrida fue justificado ya que ésta incurrió en un serio conflicto de intereses y en conducta desleal, por lo cual no se justificaba la concesión de remedio alguno a favor de la recurrida. Con este cuadro de hechos, el 18 de octubre de 2004, el Oficial Examinador concluyó que el despido de Vázquez fue injustificado, por lo que declaró con lugar la querella y ordenó la reinstalación inmediata de la recurrida en su puesto, así como el pago de todos los salarios y beneficios dejados de recibir. El Banco solicitó la reconsideración de esta Resolución, la cual fue denegada.

Oportunamente, el Banco cuestionó tal determinación ante el Tribunal de Apelaciones presentando allí un recurso de revisión administrativa. Mediante una sentencia dictada el 28 de septiembre de 2005, el Tribunal de Apelaciones confirmó la Resolución del Oficial Examinador. El Banco presentó entonces una moción de reconsideración, la cual también fue denegada.

Inconforme con la actuación del foro apelativo, el 1ro. de diciembre de 2005 el Banco presentó un recurso de *certiorari* ante nuestra consideración, y señaló los siguientes cinco errores del Tribunal de Apelaciones:

> A. Erró el Tribunal de Apelaciones al confirmar al Hon. Oficial Examinador al concluir que no existía justa causa para el despido de la Lic. Vázquez.

B. Erró el Tribunal Apelativo al concluir que la Lic. Vázquez no incurrió en conflicto de intereses.

C. Erró el Tribunal Apelativo al concluir que la Lic. Vázquez no incurrió en conducta desleal.

D. Erró el Hon. Oficial al conceder los remedios otorgados.

E. Erró el Tribunal de Apelaciones al confirmar al Oficial Examinador y no disponer que el despido fue uno justificado.

Expedido el recurso de *certiorari*, procedemos a resolver.

## II.

### A.

La Ley de Indemnización por Despido Injustificado, Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185a et seq.) (en adelante Ley Núm. 80) fue creada en respuesta al interés apremiante del estado de regular las relaciones obrero-patronales, de evitar prácticas injustas del trabajo y a la existencia en nuestra jurisdicción de una clara política pública de proteger los derechos de los trabajadores. Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364 (2001); Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35 (1986). La intención del legislador al aprobar la Ley Núm. 80 fue hacerla aplicable con carácter de exclusividad a los empleados de la empresa privada, y a los de aquellas corporaciones públicas que operan como empresa privada. *Guía Revisada para la Interpretación y Aplicación de la*

*Ley Núm. 80 de 30 de mayo de 1976,* según enmendada, Departamento del Trabajo y Recursos Humanos del Gobierno de Puerto Rico, 21 de septiembre de 2000, pág. 27. Dicha ley provee a los trabajadores despedidos sin justa causa el derecho a una indemnización que les permita suplir sus necesidades básicas durante el tiempo que razonablemente les debería tomar conseguir un nuevo empleo. Ésta indemnización es comúnmente conocida como la mesada. *Id.* En ausencia de otra ley aplicable o de un convenio colectivo que provea otro remedio, la indemnización de la mesada es el remedio exclusivo para un despido injustificado. H.I.E.T.E.L. v. Celulares, res. el 18 de septiembre de 2006, 169 D.P.R. ___ (2006), 2006 TSPR 144, 2006 JTS 153; Biver v. Coop. Fed. Emp. Telefónicos, 145 D.P.R. 165 (1998).

Como se mencionara anteriormente, aquellas corporaciones públicas que operan como empresa privada están sujetas a las disposiciones de la Ley Núm. 80. Corresponde entonces determinar si el Banco para Desarrollo Económico para Puerto Rico es una corporación pública que opere como empresa privada y, por ende, está sujeto a las disposiciones de la referida ley.

En casos anteriores hemos expuesto los criterios que se han de examinar para determinar si una entidad gubernamental es o no una corporación pública que funciona como una empresa privada. Estos son: poseer ingresos propios; tener autonomía fiscal para realizar préstamos,

emisión de bonos y cuentas bancarias; contar con una Junta de Directores; poder aceptar donaciones, Fred y Otros v. E.L.A., 150 D.P.R. 599 (2000); tener capacidad para concertar acuerdos o contratos; si los empleados están cubiertos por la Ley de Personal del Servicio Público de Puerto Rico; si los servicios prestados han sido tradicionalmente ofrecidos por la empresa privada; si la entidad está capacitada para funcionar como una empresa o negocio privado; si de hecho funciona como una empresa o negocio privado; el grado de autonomía fiscal que disfruta; el grado de autonomía administrativa del que goza; si se cobra o no un precio o tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); si los poderes y las facultades concedidos en la ley orgánica de la entidad la asemejan a una empresa privada; la estructura en sí de la entidad; la facultad para demandar y ser demandada ilimitadamente; el poder obtener fondos propios en el mercado de valores a base de su récord económico y sin empeñar el crédito del Estado Libre Asociado; si tiene sucesión perpetua; y, la facultad de adquirir y administrar propiedades sin la intervención del Estado. Huertas v. Cía. Fomento Recreativo, 147 D.P.R. 12 (1998); A.A.A. v. Unión Empleados A.A.A., 105 D.P.R. 437 (1976). **Ningún criterio es determinante por sí solo. En cada caso se deben examinar la conjunción de factores existentes para, a su luz, resolver si la entidad concernida funciona o no como**

**un negocio privado.** <u>A.A.A. v. Unión Empleados A.A.A.</u>, *supra*.

Al examinar la Ley del Banco de Desarrollo Económico para Puerto Rico, Ley Núm. 22 de 24 de julio de 1985, 7 L.P.R.A. 611 et seq., ley habilitadora del Banco, surge que aunque éste realiza funciones parecidas a otros bancos, dicho Banco tiene unas características muy particulares que lo convierten en una entidad *sui generis*.

Su ley habilitadora dispone que los negocios del Banco serán administrados y sus poderes corporativos serán ejercidos por una Junta de Directores. 7 L.P.R.A. sec. 611d. Aunque contar con una Junta de Directores es uno de los criterios a analizar para determinar si una corporación pública actúa como empresa privada, al examinar la composición de la Junta de Directores del Banco, es evidente que ésta no se ajusta al concepto tradicional de lo que es una Junta de Directores de una empresa privada. La ley habilitadora del Banco establece específicamente la composición de dicha Junta. Dicha ley dispone que la Junta estará compuesta por nueve miembros; a saber:

> ...el Presidente del Banco Gubernamental de Fomento, quien fungirá como Presidente de la Junta de Directores del Banco de Desarrollo Económico, el Secretario de Desarrollo Económico y Comercio, o uno de los directores o jefes de los componentes del Departamento de Desarrollo Económico y Comercio nombrado por el Secretario, el Director Ejecutivo de la Compañía de Turismo, el Administrador de Fomento Económico y el Secretario de Agricultura serán miembros *ex officio* de la Junta mientras desempeñen sus cargos. Los restantes cuatro (4) miembros

representarán al sector privado y serán nombrados por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado. Uno de los miembros que representará al sector privado será una persona identificada activamente con el sector agrícola, otra identificada activamente con el sector comercial y otra con el sector manufacturero. *Id.*

Como se puede apreciar, el gobierno está inmiscuido por completo en la composición del organismo que estará a cargo de administrar y ejercer los poderes ejecutivos del Banco. La mayor parte de los miembros de la Junta de Directores son funcionarios públicos y los restantes miembros son nombrados por el Gobernador con el consejo y consentimiento del Senado. Esta peculiaridad distingue la Junta del Banco de lo que usualmente es una Junta de Directores en una empresa privada.

El Banco de Desarrollo Económico de Puerto Rico se diferencia también del resto de las entidades bancarias del país en que su meta principal no es operar lucrativamente. Más bien, su propósito primordial es la promoción del desarrollo del sector privado de la economía de Puerto Rico, haciendo disponible préstamos directos, garantías de préstamos y fondos para invertir a cualquier persona natural o jurídica, con o sin fines de lucro, dedicada a la manufactura, comercio, agricultura, turismo y otras empresas de servicio, dando preferencia a los pequeños y medianos empresarios puertorriqueños. 7 L.P.R.A. sec. 611a.

El Banco también se distingue de otros bancos que operan como empresa privada en las fuentes que tiene disponible para financiar sus operaciones. A diferencia de otros bancos, sus recursos no sólo provienen de intereses de préstamos e inversiones, sino que el mismo cuenta también con asignaciones legislativas y fondos federales. M. Díaz Saldaña, *Informe de Auditoría de la Oficina del Contralor de Puerto Rico*, 1998.

Anteriormente se identificaron los criterios que se han de examinar para determinar si una entidad gubernamental es o no una corporación pública que opere como negocio privado. Al analizar el funcionamiento del Banco y su ley habilitadora, a la luz de esos criterios, es evidente que aunque éste realiza funciones parecidas a otros bancos, prevalecen unas características muy particulares que lo diferencian fundamentalmente de los demás bancos y lo convierten en una entidad sui generis. Por consiguiente, es menester concluir que por no operar primordialmente como una empresa privada, dicho Banco no está sujeto a las disposiciones de la Ley Núm. 80.

B.

Para la fecha en que ocurrieron los hechos de este caso, estaba vigente la Ley Núm. 5 de 14 de octubre de 1975, conocida como la "Ley de Personal del Servicio Público" (en adelante Ley de Personal). La ley referida creó un sistema de administración de personal

especialmente diseñado para asegurar la aplicación del principio de mérito en el empleo público. Sin embargo, no todos los empleados públicos estaban cobijados por la Ley de Personal, pues ésta, en su sección 10.6 establecía una serie de exclusiones.[72] A tenor con esta sección, la ley habilitadora del Banco dispone: "La disposición de todos los asuntos del personal del Banco se efectuará sin sujeción a la Ley Núm. 5 del 14 de octubre de 1975, conocida como Ley de Personal del Servicio Público de Puerto Rico". 7 L.P.R.A. sec. 611c.

En vista de que las acciones relacionadas al personal del Banco no están sujetas a las disposiciones de la Ley Núm. 80 ni de la Ley de Personal, los problemas como el que nos concierne en este caso deben adjudicarse conforme a las propias normas del Banco. Pasamos entonces a determinar si a tenor con las normas y reglamentos del Banco, el despido de la recurrida fue justificado.

III.

El Banco alega que el despido de Vázquez estuvo justificado ya que ésta incurrió en conflicto de intereses y conducta desleal al Banco. Le asiste la razón. Veamos.

---

[72] La Ley de Personal fue sustituida por la Ley Núm. 184 de 3 de agosto de 2004, según enmendada, Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico (3 L.P.R.A. sec. 1461e). La sección 5.3 de esta nueva ley contiene unas exclusiones similares a las de la sección 10.6 de la antigua Ley de Personal.

Las reglas y reglamentos que establecen las normas de trabajo de una empresa forman parte del contrato de trabajo. Srio. del Trabajo v. G.P. Inds., Inc., *supra*. El incumplimiento de estas normas podrá dar lugar a un despido justificado. *Id.*

El manual del Banco que establece el *"Procedimiento para aplicar acciones correctivas de disciplina"* dispone que las faltas allí enumeradas así como cualquier otra falta que sea considerada perjudicial a los mejores intereses del Banco, darán lugar a sanciones disciplinarias. En lo pertinente, dispone que "se podrán tomar acciones en situaciones no contempladas aquí, dependiendo de la severidad del acto y/o se impondrán acciones más severas en caso de falta extrema". *Procedimiento para aplicar acciones correctivas de disciplina*, 13 de mayo de 1997, pág. 1,4. Entre las faltas enumeradas en dicho manual se encuentran: realizar funciones o tareas que conlleven conflicto de intereses con sus obligaciones como empleado del Banco, y la violación a la Ley de Ética Gubernamental y sus reglamentos, o a cualquier otra disposición relacionada a la ética de los empleados públicos. *Guías para acciones correctivas de disciplina*, 13 de mayo de 1997, pág. 3-4. De un análisis de los hechos del caso, tenemos que ineludiblemente concluir que mediante sus actuaciones, la recurrida incurrió en ambas faltas.

La Ley de Ética Gubernamental censura enérgicamente cualquier tipo de conflicto de interés. Específicamente dispone en su exposición de motivos: "Es intolerable que existan funcionarios públicos en representación de la administración del Gobierno que puedan lucrarse del patrimonio del pueblo. Los conflictos de intereses, especialmente financieros ... son también intolerables". Ley Núm. 12 de 24 de julio de 1985, (3 L.P.R.A. sec. 1801 et seq.). Dicha ley define conflicto de intereses como "aquella situación en la que el interés personal o económico del servidor público o de personas relacionadas a éste, está o puede razonablemente estar en pugna con el interés público". *Id*, Art. 1.2. Precisamente ésta es la situación presente en este caso.

La recurrida, en virtud de su puesto como Directora de la División Interina de Préstamos Especiales y Recobro, estaba encargada de recobrar lo adeudado al Banco por los clientes morosos. Al mismo tiempo, no hizo acto afirmativo alguno por satisfacer su deuda con el Banco, la cual sobrepasaba los $485,000. Cabe señalar que la recurrida nunca hizo pago alguno en abono a la deuda, a pesar de que al momento del despido ésta devengaba un sueldo anual de $64,896. Por consiguiente, el Banco se vio obligado a recurrir a un procedimiento judicial de cobro de dinero. Aun así Vázquez no respondió por su deuda, sino que ésta ignoró todos los procedimientos, por lo que el Tribunal procedió a dictar sentencia en rebeldía. Al momento del

despido, la recurrida tenía una sentencia final y firme en su contra, la cual le ordenaba pagar al Banco la cantidad de $485,398.88.

Vázquez estaba consciente de que las dos solicitudes de préstamos originales presentadas por Hecson habían sido denegadas por falta de garantías suficientes para el repago. Por tal razón, con miras a obtener el dinero solicitado, ésta se ofreció como garantizadora solidaria del préstamo. Valga resaltar que para esa fecha la recurrida ya trabajaba en el Banco, por lo que tenía un deber de fidelidad y fiducia para con éste. Vázquez incumplió su deber al llevar a cabo actos de mala fe que indujeron al Banco a desprenderse de una cantidad extraordinaria de dinero, bajo la falsa creencia de que el repago de dicho dinero estaba garantizado.

Está firmemente establecido en nuestra jurisdicción que los oficiales y directores de una corporación tienen un deber de fiducia y lealtad con la entidad para la cual trabajan. A los directores y oficiales se les confieren ciertas facultades de administración para que las ejerzan en beneficio de la corporación. Por tal razón, estos se encuentran en una relación fiduciaria frente a la entidad. En vista de tal relación, los directores y los oficiales le deben lealtad absoluta, honestidad y buena fe a la corporación. Su responsabilidad es manejar los asuntos de la entidad para beneficio y protección de los intereses de la corporación. Deben actuar en todo momento buscando el

beneficio de la entidad y no su beneficio personal. En el cumplimiento de esta obligación, el trato honesto y la buena fe serán determinantes. Carlos E. Díaz Olivo, *Corporaciones*, Puerto Rico, Publicaciones Puertorriqueñas, Inc., 1999, pág. 112 (citas internas omitidas); Carlos E. Díaz Olivo, *La responsabilidad de los directores y oficiales de la corporación, un análisis comparado: Estados Unidos, España y Puerto Rico*, Vol. 52, Rev. Col. Abog. de P.R., pág. 183-84, 1991 (citas internas omitidas); Luis Mariano Negrón Portillo, *Derecho Corporativo Puertorriqueño*, 2da edición, Puerto Rico, 1996, pág. 219.

El Profesor de Derecho Corporativo, Carlos Díaz Olivo, expone en su libro:

> …el deber de lealtad encierra tanto la obligación afirmativa de proteger los intereses de la corporación, como la obligación de abstenerse de aquella conducta que lesione los intereses de la entidad. Carlos E. Díaz Olivo, *Corporaciones*, *supra*, pág. 113.

> El criterio determinante al examinar la conducta de los administradores a la luz del deber de lealtad, se circunscribe a las siguientes interrogantes: ¿Muestran sus actuaciones y conducta una falta de buena fe para con la corporación y sus accionistas? ¿Han obtenido o retenido para sí, ganancias y beneficios que mediante un esfuerzo adecuado o una actuación honesta de su parte hubiesen correspondido a la corporación? Si la contestación es afirmativa, los administradores han violado su obligación de lealtad. *Id*.

En el presente caso, ambas interrogantes se contestan en la afirmativa. Las actuaciones de la recurrida denotan que ésta antepuso sus intereses personales por encima de

sus deberes como oficial del Banco y como funcionario público. Forzoso es concluir que Vázquez violó su deber de lealtad e incurrió en un claro conflicto de intereses. Ya en Mercedes Bus Line v. Tribunal de Distrito, 70 D.P.R. 690, 695 (1949), habíamos resuelto que conducta que implique falta de lealtad y honradez hacia el patrono, constituye motivo justificado para despedir a un empleado.

Aunque como regla general no se favorece el despido como sanción a la primera falta, ello podría considerarse justificado si dicha acción u omisión, por su gravedad y potencial de agravio, pone en riesgo el orden, la seguridad, la eficiencia y el ambiente de trabajo, afectando de esa forma la buena marcha y funcionamiento normal de la empresa. Srio. del Trabajo v. G.P. Inds., Inc., *supra*; Rivera v. Pan Pepín, *supra*; Delgado Zayas v. Hosp. Int. Med. Avanzada, 137 D.P.R. 643, 650 (1994).

El caso ante nuestra consideración nos presenta una de esas situaciones en las cuales el despido es justificado a la primera falta. El conflicto entre los intereses personales de la recurrida y sus deberes como funcionaria del Banco es simplemente irreconciliable. Mantener a Vázquez en su puesto de alta jerarquía, laborando con la delincuencia y el incumplimiento de préstamos, luego de ésta haber defraudado a la entidad y haberse aprovechado del erario público, comprometería la reputación y el buen nombre del Banco. Debilitaría la obligación del Banco de exigirle a sus deudores ordinarios

que respondan ante el reclamo de pago si la misma persona encargada de conjurar la morosidad de tales deudores adeuda a su vez al Banco una sentencia que hoy día sobrepasa el medio millón de dólares. Además, someter a los demás miembros de la División a continuar trabajando con una persona tan poco comprometida con sus deberes como oficial del Banco, ocasionaría hostilidad y afectaría adversamente el ambiente de trabajo.

Es evidente de todo lo anterior que el despido de Vázquez fue justificado, por lo que ésta no tiene remedio alguno bajo la ley. Por los fundamentos expuestos, procede que se revoque la sentencia dictada por el Tribunal de Apelaciones y se ordene la desestimación de la querella presentada por ésta ante el Oficial Examinador.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO